IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

NOVEMBER 1998 SESSION

**FILED**

**June 1, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. No. 01C01-9803-CC-00118 |
| Appellee, | * | ROBERTSON COUNTY |
| VS. | * | Honorable John H. Gasaway, III, Judge |
| PAUL CARR MOSS, JR., | * | (Second degree murder) |
| Appellant. | * | |

<u>For Appellant:</u>

Gregory D. Smith
Contract Appellate Defender
One Public Square, Suite 321
Clarksville, TN  37040
(on appeal)

Michael R. Jones
Public Defender
113 6th Avenue West
Springfield, TN  37172
(at trial and on appeal)

For Appellee:

John Knox Walkup
Attorney General and Reporter

Kim R. Helper
Assistant Attorney General
425 Fifth Avenue, North
Cordell Hull Building, Second Floor
Nashville, TN  37243-0493

Dan Alsobrooks
District Attorney General Pro Tem

William J. Bradley Lockert, III
and
James W. Kirby
Assistant District Attorneys General
105 Sycamore Street
Ashland City, TN  37015-1806

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

## OPINION

The defendant, Paul Carr Moss, Jr., was indicted for the first degree murder of his wife, Peggy Ann Moss. He was convicted of second degree murder, a Class A felony. Tenn. Code Ann. § 39-13-210. The trial court imposed a Range I sentence of twenty-five years. The defendant was fined $50,000.00.

In this appeal of right, the defendant presents the following issues for review:

> (I) whether the trial court erred by permitting the state to present prior acts of misconduct between the defendant and his minor daughter;
>
> (II) whether Tenn. Code Ann. § 40-38-205, which provides for consideration of victim impact statements by the sentencing judge, is unconstitutional; and
>
> (III) whether the sentence imposed is excessive.

We affirm the judgment of the trial court. We also affirm the twenty-five year sentence, the maximum possible.

On the morning of January 14, 1995, Samuel Mattie (Matt) Moss visited the house of his brother, the defendant. At the time of his arrival, none of the defendant's four children were present and the defendant asked him to return later in the day, explaining that he intended to discuss a divorce with the victim. Upon his return sometime later, he and the defendant built a fire behind the house and then watched television in a nearby workshed. Meanwhile, the defendant walked back and forth from the workshed to the residence several times. On one of those occasions, the defendant took some items from his tool box before returning to the residence. The defendant appeared to be nervous and was sweating. On his final trip to the workshed, the defendant left the door ajar. Soon afterward, Matt Moss

2

heard a "pop" and, at first, thought the noise was caused by the fire. The defendant checked at the residence and called for his brother, telling him that the victim had shot herself. At that point, Matt Moss called 9-1-1 and heard the defendant kick the bathroom door. At trial, he testified that the "pop" sounded like either homemade fireworks or the defendant's .45 handgun.

Brian Lee Biggs, a paramedic with the Robertson County EMS, responded to the 9-1-1 call. When he arrived at the scene, a police officer directed him to a first-floor bedroom where he found the victim lying face-up on the floor. Biggs located a gunshot wound to the victim's left earlobe, determined that she had no pulse, and, due to the devastating nature of her injuries, did not administer CPR.

Detective Donald Bennett of the Robertson County Sheriff's Department found a .45 caliber semi-automatic pistol, a magazine, one spent cartridge, and one live round of ammunition above and to the right of the victim's head. The pistol holster was nearby. A piece of string knotted in a three-inch circle was found entangled in the victim's hair. Wires found at the scene were similarly tied. Detective Bennett found a piece of a Mellow Yellow pop bottle near the victim's body. The remainder of the bottle, a Christmas light, and additional wiring had been concealed under the mattress of the bed. Detective Bennett, who testified at trial that the pop bottle appeared to have been detonated, found that the door leading from the hall to the master bathroom had apparently been broken in order to gain entry to the bedroom. A second spent cartridge was located near the bed. He found a "tubular shaped," rolled piece of quilting circled by wires on the bathroom floor which he believed to be a noise suppressor. Additional wire was found in the bathroom wastebasket and in the bedroom. Quilted material of the same pattern and appearance was also located in the workshed. Detective Bennett searched the

3

workshed and found Christmas lights, live rounds of .45 caliber ammunition, and a spool of insulated wire.

Detective Bennett recalled that on the night of the shooting, Matt Moss appeared upset. He described the defendant as "quite calm" throughout the evening. Over the course of the evening, the detective began to increasingly suspect that the shooting was not a suicide. He questioned the defendant, who claimed that he had discussed divorce with the victim earlier in the day after which she had requested some time to herself. The defendant claimed to the detective that he and his brother were outside talking when they heard a noise and that when he checked, he found that the bedroom and bathroom doors had been locked. The defendant told Detective Bennett that when he called to the victim and received no answer, he punched a hole in the door, unlocked it, and found the victim lying on the floor after which his brother telephoned 9-1-1. The defendant explained that he then saw the .45 caliber pistol, disarmed it, and placed it on the floor. The defendant told Detective Bennett that he spoke to the 9-1-1 operator and attempted CPR until the authorities arrived.

Special Agent Steve Scott of the Tennessee Bureau of Investigation, an expert in the field of firearm examination, identified the .45 caliber semi-automatic pistol taken from the crime scene. He testified that a bullet from the weapon, which holds eight rounds, had caused the death of the victim. He explained that in order to fire, the weapon's safety must be disabled, a magazine inserted, a cartridge loaded in the chamber, and the hammer cocked. Agent Scott testified if the weapon were already loaded, the slide would have to be pulled to the rear of the chamber and a cartridge inserted before the gun would fire. According to Agent Scott, a third possibility was that if the gun had a cartridge already in the

4

chamber with the safety disabled and the hammer cocked, it could be discharged by squeezing the grip safety and pulling the trigger. Agent Scott also stated that if the gun were already cocked, something should be placed between the hammer and the firing pin in order to avoid firing a shot.

Dr. Charles Warren Harlan, the medical examiner for Robertson County, performed the autopsy and determined the cause of death was a gunshot wound to the head. He testified that the bullet traveled in a downward direction through the right ear lobe and the head and exited at the base of the skull. It was Dr. Harlan's opinion that the wound was most likely caused by a gunshot inflicted from a distance of more than twenty-four inches. In his view, death occurred within eight to ten minutes.

MM,[1] the defendant's seventeen-year-old daughter, lived in Niceville, Florida and was called as a witness for the state. She testified that when she was ten or eleven years old, her father made her "really uncomfortable" with his flirtations. She recalled that when she was twelve, her father told her that he wanted to help her lose her virginity and that he fantasized that she would ask him to show her how to have sex. At age thirteen, she secretly met a boyfriend one night. She recalled that the defendant had reacted with jealousy when she admitted that she had been intimate with the boy. She testified that after that incident, the defendant began "messing with [her]" in her bedroom, expressing his desire for sex, touching her breasts, and telling her that he did not know if he could stop himself from raping her. She recalled that on one occasion, the defendant entered her room and placed a rag smelling of chemicals over her face before she was able to escape. She remembered that on another occasion, he entered her room and left angrily when

---

[1] It is the policy of this court not to use the names of minor victims of sexual abuse.

5

she struggled and screamed; when the defendant threatened "it was going to happen that night," she ran from the house. MM also testified that her father had watched from a closet while she bathed and that he threatened her about telling anyone, especially the victim, who would "flip out and send him to jail," ruining everyone's life. MM recalled that when she informed the victim about the defendant's behavior, the victim had insisted that the defendant install a deadbolt lock on MM's bedroom door and a telephone in her room. She stated that the incidents involving the defendant had stopped in July of 1993.

MM also testified that she and her brother spent a month in Florida during the summer of 1994 with their maternal aunt, Cheryl McSwain. When MM told the victim that she wanted to remain in Florida, the defendant insisted that she return to Tennessee. She returned to Florida less than a week after being returned to Tennessee. She explained that she did not want to live in Tennessee because the defendant was "too controlling."

Audiotapes of journals maintained by the defendant were played for the jury. Generally, the journals include statements about his financial problems, his marriage, and MM. Pertinent portions are as follows:

> September 6, 1994
> After five or six years, I realized that [the victim] wasn't ever going to change. By that time, I was tolerating it ... and I have given up on her. Sex between us has dwindled to nearly nothing, to nothing, to absolutely nothing. ... But I am the sick one, she says. She just won't admit it. The fact that she won't admit it frustrates me to no end and I can't help but wonder if she does that on purpose? Boy, she does. It really pushes my buttons but I am doing my damnest [sic] to control myself.
> ***
> It is time for me to take hold and do something, but I just don't know what to do. Biding my time is -- I don't have time. ... Everyday that this goes on, it's going to make it worse for [my children]. ... [S]omething has to be done, I just don't know what. I am about to get desperate

though, and desperation will make a man do things he never believed he could. I know that. It will be interesting to see just what it is that I finally come up with, because as it gets worse and as the pain gets worse, I am pushed so close to doing something desperate, it is scary. Because whatever it is, I am going to have to live with it or die with it, and essentially what that means is life as I know it will end, or as I knew it, back when it was happier. Hell, this is life and it wouldn't be so bad if the life I am enjoying now would end. That wouldn't be bad at all. ... [L]ife is just getting ridiculous and it is mostly because of that damned woman, something must happen, something has got to happen.

September 20, 1994
I hate to think of all the time I have spent lately, thinking of illegal ways to get money because of the fact that many of the day-to-day problems that I have to deal with are monetarily based and would be solved with the application of funds, many of them. ... [I]f I had a way right now that I could steal a hundred thousand dollars, if I thought that I would get away with it, I would do it. ...

September 26, 1994
[The victim] is going to ... build a wardrobe now and let me worry about paying the bills. It tell you what, I am really getting tired of it. I cannot tell you how tired of it I am getting. She has never been the type to steal money from us before, but it seems that that is what she is doing now.

October 6, 1994
[My counselor] said that ... I have ... a lot of repressed anger to [the victim] which is absolutely true. ... I think that everything I did to [MM], that she did not deserve, came from my repressed feelings towards [the victim].

October 8, 1994
Plus I found out that they questioned [my other children] while they were at school. No wonder people in the office have been treating me differently lately. No wonder they have. I swear to God a man could be innocent and this shit come down and ... [e]verybody is going to believe it. ... Well, I tell you what, this is just real damn aggravating. ... I am really, really aggravated about this. I am tired of the way everything is going ... It makes me want to do something drastic. I don't know what ....

October 13, 1994
Well, this has really got me frustrated. [The victim] can't handle her sisters. ... They take the train of thought, the man needs to be punished and that they are the ones to do it, and they are trying to get [the victim] to do that, and that's pointless. ... I have been so close to the edge for

7

so long, that very much more and the responsibility that I feel towards my three children is going to begin to take less than a first priority in my life and when it does, whatever takes priority first is really going to get my attention and if revenge is it, I don't know that it won't be, it may be revenge becomes the driving force in my life. Assuming that it does, boy those bitches better say out of my way, all the fucking three of them ....

October 20, 1994
But fortunately, me and [the victim] won't be together much longer.  I have a feeling that come December, that the dam is going to break because I also decided that [MM] can't stay with Cheryl any longer.  December will be the limit.

Patricia Diane Frazier, who had known the defendant and the victim for more than three years, visited the defendant at the jail before the trial.  When she later testified, she revealed that he had passed her a note at the jail asking her find and destroy chloroform and gunpowder; on another occasion, he asked her to find some wire at his residence and keep it for him.  Ms. Frazier, who testified that she destroyed the notes he had passed, recalled that the defendant claimed access to one hundred thirty thousand dollars.  She stated that their friendship deteriorated when the defendant was released from jail because he informed her that he intended to force MM to live with him.

John Steven King, a co-worker of the defendant for nearly ten years, testified that in the summer of 1994, the defendant claimed to have purchased an additional life insurance policy on the victim, thereby increasing the death benefits of the two policies to over $150,000.00.  King recalled that the defendant said "he wouldn't mind giving up twenty thousand to solve his problem."  King was aware that the defendant had previously referred to the victim as "his problem."  Although King did not think the defendant to be serious, he interpreted the defendant's remarks to mean that he wanted to eliminate the victim.  King testified that the defendant often

discussed MM and appeared to be jealous when he learned she had secretly met with a boyfriend. He also recalled that the defendant had occasionally made bombs from pop bottles, using tissue paper, gun powder, and a firecracker fuse or Christmas tree light. King stated that when the defendant detonated the bombs at their workplace, they made a "loud boom." King recalled seeing these bombs at the defendant's home on one occasion. He also remembered that the defendant once said that chloroform could be used to "put somebody unconscious" because it was heavier than air. King stated that he was aware that the defendant was very unhappy about MM living in Florida.

Kenneth Hudgens, Clerk of Court for Robertson County, testified that a lawsuit had been filed by the Administratrix of the estate of the victim against American General Life Insurance Company. Hudgens reported that the settlement of $100,800.83 was paid to the defendant's mother, Norma Gammon. There was also a lawsuit against New York Life Insurance Company by Monica Cano, the trustee of the victim's minor children, Hudgens testified that approximately $61,000.00 had been paid to Ms. Cano.

Diana Fields, a claims investigator with American General Life Insurance, testified that the policy on the victim's life, issued in February of 1988, had a face value of $100,000.00. She stated that the defendant was named the primary beneficiary on the policy and that the defendant's mother was named the secondary beneficiary. She recalled that the defendant contacted her December 14 and 15, 1994, to change the residence address and bank account from which the monthly payment was drawn. None of the requested changes affected the amount of the policy or the designated beneficiaries. Ms. Fields testified that in December of 1988, American General Life Insurance issued a life insurance policy covering the

9

defendant with the victim as the designated beneficiary and his mother as secondary beneficiary.

Dr. Steve Chauncy, an expert in firearms identification and trace evidence examination, testified on behalf of the defendant. Dr. Chauncy performed tests on a piece of the quilted material, the same as that the state argued the defendant had used to suppress the noise caused by the discharge of the .45 caliber pistol. After cutting a piece of the quilted material in the same dimensions as that found near the victim's body, he wrapped and wired it around the pistol. Dr. Chauncy test fired the weapon using the same type of ammunition found at the crime scene. When he removed the material from the weapon, there were gunpowder marks on the inside and the material was singed on one end. By comparison, the material found by the police near the body did not have burns or black marks. Dr. Chauncy also testified that there was no significant difference in the noise created by firing the pistol whether or not it was wrapped in the material.

Dana Robert Sudberry, who worked with the defendant, recalled that the defendant had back problems, frequently displayed pain, and carried a special pillow in his car. Buford Sudberry, the defendant's employer, testified that the defendant was a talented cabinet maker. He had observed the defendant wearing a back brace and had often heard him complain of back pain. Sudberry remembered that on one occasion, the defendant had dropped a sander during a back spasm. He recalled meeting the victim and the defendant's children. Sudberry observed that the defendant controlled them "like Hitler" and that the children appeared to be afraid to speak unless directed to do so.

Phillip Scott Mason testified that he and Don Yount saw the defendant

on the day before the murder in some woods near Smiley Hollow Road.

Paul C. Moss, III, the defendant's son, acknowledged that his father suffered from back problems. He stated that at times his father had to take time off from work and sometimes required the help of his children to move from the couch. He recalled on that the day of the shooting, the defendant drove him to town to do community service work. On cross-examination, Paul Moss, III, acknowledged that he was aware that his parents were having marriage difficulties and was aware that the defendant had "bugged" the telephones and certain rooms of the house. Paul Moss III had seen the defendant use the .45 caliber pistol but was not allowed to touch the pistol. He recalled that on one occasion a friend had stolen some of the defendant's marijuana crop; he remembered that his father fired his weapon in his direction after learning of the incident.

The defendant testified that he and the victim had lived together sixteen years and had four living children. He recalled that he and the victim purchased life insurance policies in 1988 and that, the summer of 1994, the victim acquired an additional policy through her employer. The defendant denied having had a conversation with King in which he discussed using twenty thousand dollars of the life insurance proceeds to get rid of his "problem." He claimed that the changes to the policies in December of 1994 were routine.

The defendant testified that when he learned that MM refused to return to Tennessee from Florida, he had placed his .45 caliber pistol to his head in the presence of the victim in contemplation of suicide. The defendant stated that MM returned to Tennessee but that five days later, he permitted her to return to Florida.

The defendant stated that in the fall of 1994 he started a journal, sought counseling, and began taking Prozac to treat depression. He spoke to an attorney about a divorce and discussed the topic with the victim on several occasions. He claimed that he and the victim had agreed that the children would be permitted to choose the parent with whom to live. The tenants of their rental property had been asked to vacate so that the victim could reside there. He had contacted the attorney again around Christmas of 1994 and he noted in his journal that "[the victim] will be able to step right into her new life without me." At trial, the defendant explained that he had meant that she would have a nice house, a nice neighborhood, and affordable expenses.

The defendant acknowledged that he had made homemade bombs or fireworks since the age of thirteen and he had often exploded pop bottles using gunpowder and a Christmas tree light. He admitted that on the weekend of the shooting, he had been making fireworks with copper tubing, steel wool, and gunpowder. He claimed that he had used the quilted materials found in his workshed as shop rags. He had wrapped the quilted material around the copper tubing and secured it with wire because the explosion caused the tubing to heat up, preventing him from handling it. He contended that he set off the firework for the victim's enjoyment upon her return from work. When she did not comment and walked inside the house, he followed her, holding the firework. He testified that when the victim asked if he didn't have "anything better to do" with his time, he became angry, dismantled the firework as he left, and dropped the cut wires on the floor. He claimed that he threw the quilted material to the floor near the garbage can in the bathroom.

The defendant testified that on the day before the victim's death, he

had gone to Smiley Hollow Road to shoot his .45 pistol. He recalled that when two men drove up and stopped, he was about half way through the clip. The defendant stated that he then uncocked the pistol, placed it in his jeans, and covered it with his shirt. He stated that there would have been one or two bullets in the clip and one in the chamber. After talking with the two men for a few minutes, the defendant left because it had become too dark to shoot. He explained that as he left, he took several bullets from his shirt pocket, placed them in the magazine, and put the magazine in the pistol. He stated that when he arrived home, he placed the pistol in a holster in the bedroom. The victim was about to leave for work. He had arranged for his youngest daughters to spend the night elsewhere so he could talk further with the victim about divorce. He explained that the next morning he left his son, Paul, in town to do some community work.

The defendant testified that on the day of the shooting, he and the victim were in the bedroom to discuss divorce. He claimed that both were sitting on the floor when the victim pointed to the defendant's pistol and said, "[W]hat's that thing doing in the house?" He stated that when she directed him to move the weapon from the house, he removed the pistol from the holster, cocked it, and pulled the trigger so as to guide the hammer down slowly with his finger. He claimed that as he did so, he was aiming the pistol toward the television and away from the victim. The defendant contended that he then suddenly experienced a back spasm and instinctively clenched his hand, causing the pistol to discharge in the direction of the victim. He contended that as soon as he was able to move, he crawled to her side to help but found no pulse. The defendant stated that his attempts at CPR were in vain. He acknowledged his failure to call 9-1-1 and claimed that he decided to try to make the death look like a suicide. The defendant decided to detonate a homemade bomb to attract Matt Moss to the room to discover

13

the body but before doing so, he threw an empty cartridge to the floor and rolled the victim onto her side, as she had originally fallen. The defendant then attached an alarm clock as a timer to delay the detonation. The defendant testified that he left the pistol on the floor, loaded and cocked and closed the victim's eyes, apologized, and kissed her forehead. He admitted that as he left, he barred one bedroom door and locked the other behind him. The defendant stated that he wrapped his bloody clothes in newspaper, walked outside, and burned them.

When the bomb exploded, he and his brother walked to the house. He then went to the barred door and yelled for the victim before walking through the bathroom to the other door and breaking inside. The defendant acknowledged that he had a key in his pocket at the time and that he threw his keys on the bed after he entered the room. Because the room was smoky from the bomb explosion, he opened a window, turned on a fan, and unbarred the main door to the bedroom. As his brother called 9-1-1, the defendant placed the alarm clock in a drawer, threw electric wire used to detonate the device in the clothes basket, and shoved the remains of the homemade bomb between the mattress and the box springs. When questioned by the authorities, the defendant claimed that the victim committed suicide. At trial, he admitted that he had lied.

I

The defendant contends that the trial court erred by permitting the state to present prior acts of misconduct between the defendant and his minor daughter. In response, the state contends that evidence of sexual misconduct between the defendant and his daughter was probative of his motive and intent to commit the crime of murder.

14

Rule 404(b) provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Generally, this rule is one of exclusion but there are, as stated, exceptions. See State v. Parton, 694 S.W.2d 299 (Tenn. 1985); Bunch v. State, 605 S.W.2d 227 (Tenn. 1980); Carroll v. State, 370 S.W.2d 523 (Tenn. 1963); see also State v. Rickman, 876 S.W.2d 824 (Tenn. 1994) (favorably citing both Parton and Bunch). Most authorities suggest trial courts take a "restrictive approach of 404(b) ... because 'other act' evidence carries a significant potential for unfairly influencing a jury." See Cohen, Paine and Sheppeard, Tennessee Law of Evidence, § 404.7 at 131. That perhaps best explains the traditional posture of the courts that any testimony of prior bad acts by a defendant, when used as substantive evidence of guilt of the crime on trial, is not usually permissible. Parton, 694 S.W.2d at 302-03. The exceptions to the rule are when the evidence is offered to prove the motive of the defendant, his identity, his intent, the absence of mistake, opportunity, or as a part of a common scheme or plan. Bunch, 605 S.W.2d at 229. Our supreme court recently spoke on the procedure used to determine whether a prior crime or bad act fell within an exception to the rule:

15

> [I]f evidence that the defendant has committed a crime separate and distinct from the one on trial is relevant to some matter actually in issue in the case on trial, and if its probative value as evidence is not outweighed by its prejudicial effect upon the defendant, then such evidence may be properly admitted.

State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993) (citing Bunch, 605 S.W.2d at 229). In Howell, the court applied the balancing test to determine whether prior convictions for other crimes were admissible, as an exception to the general rule, for purposes other than the character of the defendant. See also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). When the trial court substantially complies with the requirements of Rule 404(b), we review the trial court's determination for an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

At an extensive pretrial hearing, MM testified to incidents of inappropriate sexual conduct by the defendant. That testimony was nearly identical to her testimony at trial. Other witnesses testified to additional prior bad acts on the part of the defendant. While the trial court chose to exclude much of the prior bad acts evidence, it ruled that MM's testimony was probative of motive and intent, "given the theory of the State that this killing ... was committed by [the defendant] specifically to receive proceeds of an insurance policy and also to regain access to his daughter, which the State contends he was obsessed with and had a sexual attraction for." The trial court determined that the probative value was "significant" because the incidents related by MM were corroborated by the defendant's admissions in his journal. In consequence, the trial court ruled that the probative value of MM's testimony was not outweighed by the danger of unfair prejudice.

The trial court provided the following instruction to the jury:

[Y]ou have heard evidence that the defendant ... may

16

have committed some act or wrong or crime other than that for which he is on trial. For example, there has been specific reference made to [MM] and improper conduct towards her or suggestive behavior with her. There has been some reference about obtaining insurance proceeds. There has been some reference about making explosive devices. There has been some reference about using chloroform to induce sleep on someone.

Now, you may not consider such evidence of other acts or wrongs or even crimes in your determination of whether the defendant is guilty of first-degree murder. The evidence of other acts or wrongs or crimes may be considered only for the specific purpose of determining whether that evidence provides motive;... that evidence may be considered by you if it tends to show motive of the defendant for the commission of first-degree murder or you may consider it for determining whether or not there was some intent on the part of the defendant[.] In other words, the evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime of first-degree murder. But again, I remind you, you must remember that evidence about other things must not be considered by you for any purpose other than the limited purpose of determining motive or intent.

The trial court complied with the requirements of Tenn. R. Evid. 404(b). The record supports the trial court's determination that the evidence was material to a matter in issue at trial, that being the defendant's motive and intent to shoot the victim. The state's theory was that the defendant shot his wife in order to collect insurance proceeds and to regain access to his minor daughter.

The defendant argues that the 404(b) evidence was not relevant to prove motive or intent because the victim also wanted MM to return. He contends that if he were going to kill the victim in order to get access to his daughter, he would have done so in August of 1994, when MM left, rather than in January of 1995. In a November 1994 journal entry, however, the defendant made statements to the contrary:

I am excited about the weeks going by. I realize that next

17

month, I am going to be taking care of some of my problems. I am going to do something about it. I don't know what exactly, that depends on [the victim] and the other circumstances, but [MM] is coming home whether she wants to or not, whether [the victim] wants her to or not. It doesn't matter, she's coming home or at least to Nashville. She doesn't have to stay with me. She is going to be close though. She is going to be in town.

(Emphasis added). Just four days before the shooting, the defendant contemplated bringing MM back to Tennessee against her will:

If [MM] gives me trouble, if she doesn't want to come back with me or anything like that and gives me trouble, he suggested maybe just say hey -- let's go to McDonald's and once she is in the car, don't stop until I hit the state line. He said I needed to get out of the state of Florida as quickly as I could.

So anyway, that's what -- I guess that's what I need to worry about, what I need to work on. ... I have already had an idea to put a solenoid lock on the rider's side door so that I can lock the door from over here to where it cannot be opened. ...

***

Oh man, I will just have to dwell on this for a few days and see if some kind of cogent plan starts to gel in my mind. I am a little afraid to talk to [the victim] about this and tell her about this because if I tell her that I want the divorce now, then I am afraid if I tell her that, then she'll know that I want [MM] home, and if she tells them down there that, then it's quite possible that they will hide [MM]. If they hide [MM], there wouldn't be any way that I could find her. ... But then I think about it for a while and I come up with a plan. So I have to figure out how to tell [the victim] this. ...

Boy, [MM] is going to hate coming back. ...

(Emphasis added).

The prior bad acts evidence supplies a motive and an intent for the murder. It was offered to explain the defendant's focus on MM, her reluctance to return to Tennessee, and an ongoing conflict between the defendant and the victim. The evidence was unrefuted and the defendant admitted that his daughter had testified truthfully. In our view, the trial court properly ruled that the evidence had strong probative value. While there is obviously a risk of unfair prejudice,

18

particularly when allegations of sexual misconduct are involved, the trial court had provided the jury with limiting instructions immediately following the testimony at issue and did so a second time in the general charge. It is our conclusion that the probative value of this evidence was not outweighed by a danger of unfair prejudice and that the trial court did not abuse its discretion by admitting this evidence.

II

Next, the defendant challenges the constitutionality of Tenn. Code Ann. § 40-38-205, a section of the Victim Impact Statement Act that provides for inclusion of written victim impact statements in the pre-sentence report. The defendant maintains that consideration of written victim impact statements by the sentencing court violated the Confrontation Clause of the United States Constitution because the defendant was not permitted an opportunity for cross-examination of the person who submitted the statement. He does not complain of an intrusion upon this right under the Tennessee Constitution. See Tenn. Const. art. I, § 9 (providing for the right "to meet witnesses face to face").

Victim impact evidence is not per se improper under statutory or constitutional law. State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998); State v. Burns, 979 S.W.2d 276 (Tenn. 1998). The Victim Impact Statement Act directs the preparation of a victim impact statement by the Department of Correction. Tenn. Code Ann. § 40-38-205. The department must notify victims or their family members that they have an opportunity to present a victim impact statement. Tenn. Code Ann. § 40-38-204(a). A uniform victim impact statement form is utilized to gather information. See Tenn. Code Ann. § 40-38-204(b). Once the statement is complete, it is incorporated into the pre-sentence report and the trial court is required to consider the evidence before imposing the sentence. Tenn. Code Ann.

19

§§ 40-38-205, -207, & -202.  To provide ample notice to the defendant, the pre-sentence report must be filed with the clerk of court ten days before the scheduled sentencing hearing.  Tenn. Code Ann. § 40-38-206.

It is well settled in Tennessee that a trial court has statutory authority to admit trustworthy and probative evidence, including hearsay, for sentencing purposes.  State v. Flynn, 675 S.W.2d 494 (Tenn. Crim. App. 1984); State v. Chambless, 682 S.W.2d 227 (Tenn. Crim. App. 1984); Tenn. Code Ann. § 40-35-209(b).  Reliable hearsay is admissible in a sentencing hearing so long as the opposing party has a fair opportunity to rebut the evidence.  Tenn. Code Ann. § 40-35-209(b).  The Sentencing Act provides, however, that no evidence secured in violation of the constitution of the United States or of Tennessee may be admitted.  Tenn. Code Ann. § 40-35-209(b).

The Sixth Amendment guarantees an accused the right to be "confronted with the witnesses against him."  U.S. Const. Amend VI.  "Confrontation means more than being allowed to confront the witness physically."  Davis v. Alaska, 415 U.S. 308, 315 (1974).  It includes the right to an effective cross-examination.  Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  Nonetheless, constitutional rights have a broader reach before a determination of guilt than they do thereafter in a sentencing hearing.  State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998) (quoting State v. Newsome, 798 S.W.2d 542, 543 (Tenn. Crim. App. 1990)); cf. State v. Mackey, 553 S.W.2d 337, 344-45 (Tenn. 1977).  The United States Constitution does not restrict a sentencing judge to consideration of information received in open court.  Williams v. New York, 337 U.S. 241, 251 (1949).  In Williams, the United States Supreme Court reasoned as follows:

> We must recognize that most of the information now
> relied upon by judges to guide them in the intelligent

20

> imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life. The type and extent of this information make totally impractical if not impossible open court testimony with cross-examination.

Id., 337 U.S. at 250. Based upon this rationale, our conclusion is that consideration of written victim impact statements pursuant to Tennessee Code Annotated, section 40-38-205 does not violate the Confrontation Clause of the United States Constitution. Such evidence, however, must be reliable and the defendant must have a fair opportunity to rebut the statement. Tenn. Code Ann. § 40-35-209(b).

The defendant relies upon State v. Wade, 863 S.W.2d 406 (Tenn. 1993), wherein our supreme court reversed and remanded the revocation of probation because the only evidence of a probation violation was unreliable hearsay. In our view, the holding in Wade does not support the defendant's contention. The court in Wade recognized that the right to confront and cross-examine an adverse witness is "not absolute and may be relaxed" in a probation revocation hearing. Id., 863 S.W.2d at 407. The probationer must be guaranteed due process which may include a limited right to confront and cross-examine adverse witnesses. Id. Nonetheless, the right to cross-examine witnesses in such a proceeding may be denied by the trial court upon a finding of good cause. Id. at 408 (quoting Gagnon v. Scarpelli, 411 U.S. 778 (1973)). See also State v. Gregory, 946 S.W.2d 829 (Tenn. Crim. App. 1997). The matter was remanded because the reviewing court could not determine from the record whether there was good cause to forgo in-court testimony or whether the hearsay report was reliable. Wade, 863 S.W.2d at 408.

Here, the trial court admitted and considered the written victim impact

statements of MM and Ms. McSwain. The trial court made no finding of reliability on the record but did establish that the statements were obtained by the state through the normal course of business. The state submits that the statements themselves were reliable because MM and Ms. McSwain had testified previously and the trial court had an opportunity to judge their credibility. The record, however, contains no finding of credibility by the trial judge. The state also contends that the defendant provided no reason for questioning the reliability of the statements and that the defendant was permitted an opportunity to rebut the statements. We must disagree. Initially, defense counsel objected to admission of the statements at the sentencing hearing as follows:

> Your Honor, I can't really tell who has written these?
> Some of these are on the victim impact statement form.
> Some are just letters, not signed? It may be that all of
> these are from one person, I can't really tell? Most of it is
> opinion and things that are not reliable hearsay ....

MM submitted her comments on the standard form and attached a letter addressed to her from the victim's employer; a portion of the newsletter by the victim's employer describing the victim's work and her contribution to her family and the community; and a copy of a poster depicting a photograph of a coffin with a spray of flowers and the words, "He beat her 150 times... [s]he only got flowers once." In handwriting that does not appear to be MM's, are the words, "Poster on her office door at Metro Health Dept....[s]ums it up but she never got flowers." (Emphasis in original). Ms. McSwain submitted the standard form and attached four additional sheets, only two of which bear her signature.

The statute provides for a statement from a victim or an immediate family member of a homicide victim. Tenn. Code Ann. § 40-38-203(1). The statement should address "financial, emotional, and physical effects of the crime ... and specific information about the victim, the circumstances of the crime, and the

manner in which it was perpetrated." Tenn. Code Ann. § 40-38-203(2). In our view, the statements included on the standard form were properly considered by the trial court. The source of the information is readily identifiable; the statements bear the author's signature and are responsive to the questionnaire. The poster with the handwritten notation, the letter to MM from the victim's employer, and the excerpt from the employer's newsletter should not have been admitted or considered by the sentencing court because they are not identifiable statements of the victim's immediate family. See Tenn. Code Ann. § 40-38-203(1).

Despite of the statutory requirement that the pre-sentence report be submitted ten days prior to the hearing, the victim impact statements in this case were not provided to the defendant until the day of sentencing. Defense counsel did not object on this basis and did not request a continuance. In that regard, any issue predicated upon the timeliness of the report is waived. Tenn. R. App. P. 36(a). Although some of the attachments to the victim impact statements were erroneously admitted, there is no need to remand this matter for re-sentencing because we have conducted a de novo review of the sentence under Part III of this opinion. In our de novo review, we will not consider the erroneously admitted evidence.

III

As his final issue, the defendant contends that the sentence imposed by the trial court is excessive. He maintains that the trial court improperly enhanced the sentence, failed to make the findings of fact, and erroneously determined the presumptive sentence to be twenty, rather than fifteen, years.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a

presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Here, the trial court applied a presumptive mid-range sentence of twenty years pursuant to Tenn. Code Ann. § 40-35-210(c) (Supp. 1996). That provision, however, was not in effect at the time of the offense. Prior law requires the minimum possible term as the beginning point. The application of the twenty-year presumptive sentence as a starting point for an offense committed prior to July 1, 1995, would constitute an ex post facto violation of the defendant's constitutional rights. State v. James Holloway, No. 01C01-9608-CR-00330, slip op. at 2 (Tenn. Crim. App., at Nashville, June 30, 1997). In consequence, our review must be de novo without a presumption of correctness.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

24

In calculating the sentence for felony convictions committed before July 1, 1995, the presumptive sentence is the minimum within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c) (1990) (amended July 1, 1995 to provide that the presumptive sentence for a Class A felony as the midpoint in the range). If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the minimum. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210. The sentence may then be reduced within the range by any weight assigned to the mitigating factors present. Id.

The 1989 Act was designed to ensure that every sentence is justly deserved in relation to the seriousness of the offense. Fair and consistent treatment is paramount. The potential for rehabilitation or treatment is an important consideration. All sentences should be "the least severe measure necessary to achieve the purposes of a sentence." Tenn. Code Ann. § 40-35-103.

At the sentencing hearing, Monica Cano, sister of the victim, testified that she and the defendant had "ill-feelings" because she had confronted him about abusing his children. She believed that the defendant was a poor provider for the family and described him as a "loud, very abrasive" husband who "put [the victim] down a lot." Ms. Cano thought the defendant to be a "very abusive" father. She testified that the defendant was controlling, manipulative and dangerous.

Richell Fontana, a friend to the victim, had known the victim and the defendant for nine years. She testified that she had observed them together often

and she thought that they had a good relationship. She never saw the defendant abuse his children or the victim. She acknowledged, however, that the victim had mentioned obtaining a divorce.

Bradley Wayne Moss, uncle to the defendant, testified that he had seen the defendant interact with his children regularly over the years and thought the defendant to be more focused on teaching them and less focused on control. He recalled that the defendant was a "workaholic" who always worked two jobs.

The defendant, forty-three at the time of sentencing, has a high-school diploma. He attended Tennessee Technical University but did not obtain a degree. He claimed a birth defect in his lower back and reported past marijuana use but maintained he had not used alcohol or illegal drugs since August 1994. At the time of his arrest, the defendant was attending counseling and taking Prozac. He has four children. He had been employed at Sudberry Millwork since August of 1985.

As part of her victim impact statement, MM wrote that she and her siblings had been orphaned, that she feared the defendant, and that he had never told her he was sorry for shooting the victim. Ms. McSwain described financial and emotional difficulties experienced by her and the victim's children. She asked for the maximum sentence.

At the sentencing hearing the defendant stated that his own suffering had been ignored and that he was convicted of a crime that he never committed. He also stated that he was sorry for "what happened" and asked the forgiveness of his children for his carelessness and stupidity.

The defendant qualifies as a Range I offender. The sentencing range is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The defendant's potential for rehabilitation is poor. The record demonstrates that he lied to authorities, lied to the 9-1-1 operator who tried to assist him, and solicited Ms. Frazier to destroy incriminating evidence.

The record supports the application of two enhancement factors. Initially, the defendant utilized a .45 caliber semi-automatic pistol to kill the victim. Tenn. Code Ann. § 40-35-114(9). Secondly, the defendant has a history of criminal behavior. Tenn. Code Ann. § 40-35-114(1). MM testified to at least one incident of inappropriate touching by the defendant. He also attempted to subdue her with chloroform or some other chemical. The defendant also admitted to manufacturing marijuana for personal use, which we also consider to be prior criminal behavior. The defendant argues that these acts toward MM should not be considered to enhance his sentence because the state relied upon those facts to establish motive. By the terms of the Tennessee Code Annotated, § 40-35-114, however, the sentencing court may rely upon the past criminal behavior a defendant to enhance the sentence so long as that enhancement factor is not an essential element of the crime. In Jones, our supreme court explained that "[f]acts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment." 883 S.W.2d at 601. Second degree murder is merely "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b). In our view, the defendant's prior acts are not

27

essential elements of a knowing killing.  Motive is not an essential element.  We afford significant weight to each of these factors.

As for mitigating evidence, the defendant relies upon his work history, lack of a criminal record, and testimony relating a positive relationship between the defendant and his children.  Tenn. Code Ann. § 40-35-113(13).  The defendant is entitled to only slight mitigation under these factors.  See State v. McKnight, 900 S.W.2d  36, 55 (Tenn. Crim. App. 1994).

In our view, the two enhancements outweigh considerably any mitigation and warrant a high-range sentence.  We begin at fifteen years and apply the enhancement factors.  Because the enhancement factors weigh so heavily, a sentence of twenty-five years, the maximum possible, is deemed appropriate.

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:


_____
John H. Peay, Judge


_____
Jerry L. Smith, Judge