IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 1, 2005 Session

## STATE OF TENNESSEE v. BEVERLY DIXON

**Appeal from the Criminal Court for Shelby County**
**No. 03-00289     Arthur T. Bennett, Judge**

**No. W2004-00194-CCA-R3-CD   - Filed June 30, 2005**

The defendant, Beverly Dixon, pleaded guilty to one count of felony Class B theft of property over $60,000. The trial court imposed an incarcerative eight-year sentence and denied any form of alternative sentencing. On appeal, the defendant argues that the sentencing process was flawed by the introduction of prejudicial hearsay and that the trial court should have granted probation or placement into a community corrections program. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Larry M. Sargent, Memphis, Tennessee, for the Appellant, Beverly Dixon.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Beginning in 1997 and continuing until August 1999, the defendant systematically embezzled at least $133,000 from her employer, Ligon-Hughes Real Estate Company. The defendant was initially hired in as a receptionist and later worked as a bookkeeper for the Shelby County-based company. The defendant's larcenous conduct netted her an indictment charging two counts of theft of property over $60,000. *See* Tenn. Code Ann. §§ 39-14-103, -14-105(5) (2003). By agreement with the state, the defendant pleaded guilty to one charge of Class B felony theft of property over $60,000 with a corresponding sentence of eight years as a Range I standard offender. The manner of service of the sentence was reserved for the trial court's consideration and determination.

The record before us contains a transcript of the defendant's plea submission, containing the following factual basis for the plea:

> . . . Ms. Nancy Ligon-Hughes owned a real estate company here in Shelby County[,] Tennessee. Ligon-Hughes' Real Estate Company located at 1716 Locket Place.
>
> This defendant, Ms. Beverly Dixon, was employed as the bookkeeper for her company. In the course of running this business, Ms. Hughes started to suspect that Ms. Dixon had been embezzling money from her company, because the amount of receipts that the company was taking in had gotten low – had become extremely low. Ms. Hughes reported this possible theft to the Memphis Police Department on or about August 31, 1999.
>
> Ms. Hughes had hired a private investigator to assist her in trying to document what had happened to the proceeds of this business and why the business was taking in a small amount of money relative to what the business had been doing.
>
> The investigation indicated that during the first part of 1997, this defendant, while employed as a bookkeeper, was not an authorized signer of any company checks that had been printed on the computer. The investigation revealed that Ms. Dixon had used a company issued AT&T credit card, and she had made numerous personal purchases during the period of time as alleged in this indictment – during the period of time in which this offense was committed rather, and this period of time is August 1, 1998 and September 1, 1997 [sic]. But the thefts actually go back to the first part of 1997.
>
> Ms. Dixon would use company issued credit cards, and make personal purchases on that company card. Then she would pay for those purchases by using company checks that were printed by Ms. Dixon on her computer, and she forged Ms. Hughes' signature on those checks.
>
> A further investigation revealed that Ms. Dixon had also created unauthorized company checks from different accounts and made those checks payable directly to herself. This defendant used her own personal Union Planters bank account number and signed her own signature on those checks that she had printed and had forged without permission, over [sic] consent or knowledge of Ms. Hughes.

She would record those checks in the computer system and she would void those checks. When those checks came in for processing, she would intercept the checks and the bank statement, and would hide this elaborate theft scheme that she had used, in order to steal this money from the victim.

The victim was able to document, in the course of this investigation, at least $133,000 that was stolen by this defendant. That's probably a conservative figure, because it was hard to document some additional thefts that Ms. Hughes believes that the defendant was responsible for but was not able to provide documentation.

Also in the record is a presentence investigation report, which contains the thoughtful and poignant victim-impact statement of Ms. Ligon-Hughes. In her statement, Ms. Ligon-Hughes explains how the defendant's criminal conduct caused the loss of her business, the depletion of her retirement assets, and time lost from her family:

> All together I would say that my monetary loss from costs related to the theft was approximately $240,000.

> After so much loss, I didn't have enough money to run my company. I had to sell several rental properties that I had acquired over many years. The equity that had been built up was for my retirement. Instead I had to use it to keep my company afloat. Eventually after 15 years of being in business, I had to shut the doors and go to work for someone else. Now that retirement money is gone also and I don't have the health or the years to do it again . . . .

> It was my goal to at least partially retire by 65 and spend more time with my family. I will be 65 in just over a year and I have no hope of retiring soon because of the debts that I owe because of the embezzlement. I work seven days a week from early in the morning to evening.

> The tragedy of all this is the time I have lost with my loved ones. I have always been close to my parents. They are both 88 years old and both have terminal illnesses. Yet I am lucky if I can spend a few hours a week with them and I am not going to have them much longer.

> My husband who is older than I am is now retired. His health has not been good and I have very little time to spend with him.

I have eight grandchildren who are growing up very fast and I have almost no time to see them. My daughter in Dallas has two small children. The little boy is extremely handicapped. In November, he had to be rushed to the hospital where he stopped breathing. Fortunately the doctors brought him back. Because of work and finances, I am not in a position to go to Dallas very often to help my daughter. She needs me and I have not been able to be there for her as much as I should.

When people have died or children are grown up, there is no way to get the time with them back.

Recently, I have had some health problems that cause me to wonder if I will be able to continue working as before.

In connection with the sentencing hearing,[1] the defendant testified that she was 32 years old, married, and had three preschool-age children. The defendant was not currently employed, although she explained that she had arranged to have a job depending on the court's determination regarding manner of service of her sentence. The defendant's husband was employed, and she said that he was willing to help make restitution. As part of her restitution plan, the defendant had taken out a loan for $15,000, the proceeds of which she had brought to court, and she claimed that from her husband's earnings, she could pay $1,200 per month.

The defendant said that her initial motivation in stealing the money was for her "family to put food on the table" and to pay delinquent bills. Later on, she "did buy some frivolous items with the credit card that [she] had misused." The defendant stated that during the relevant times, she suffered from severe depression. The defendant admitted her wrongdoing and insisted that she would do anything to pay back Ms. Ligon-Hughes.

The state elicited on cross-examination that since the defendant was fired approximately four and one-half years earlier, she had made no restitution whatsoever. Regarding the "frivolous items" purchased, the defendant conceded that she had bought Christmas presents,

---

[1] The record reveals that the presentence investigation was ordered on December 11, 2003, prior to the defendant's guilty-plea submission. In addition, we note that the plea submission and the sentencing hearing to determine the manner of service of the sentence occurred the same day, on January 13, 2004. Code section 40-35-208 provides, "The presentence report shall be filed with the clerk of the court, and complete copies shall be made available to the parties within ten (10) days prior to the sentencing hearing which may be waived by the consent of all parties and the court." Tenn. Code Ann. § 40-35-208 (2003). That section "mandates the availability of the pre-sentence report to the defendant and the trial judge has inherent power to address any complaint regarding noncompliance." *State v. Vernon Lamar Bryant*, No. E2002-01234-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Aug. 26, 2003). From the lack of objection or comments in the record, we surmise that neither the parties nor the court objected to the timing and scheduling of the proceedings.

jewelry and diamonds for herself, her mother, and mother-in-law, hunting equipment for her husband, an expensive camcorder, and even a birthday present for Ms. Ligon-Hughes from whom the defendant was embezzling. Additionally, the defendant made numerous purchases from the Home Shopping Network, some of which she said was returned and credited "because it did not fit." The defendant insisted, however, that she had stopped writing herself checks and using the credit card months before she was "caught."

The trial court questioned the defendant about her former employers. The trial court noted that Ms. Ligon-Hughes's victim-impact statement referenced talking with the owners of other real estate companies who described the defendant as dishonest. The defendant's response was that she was a receptionist for those companies and "was not in any way involved in any money."

The defendant's husband testified briefly in her behalf. He voiced his support of the defendant, including helping her to make restitution.

Ms. Ligon-Hughes testified. She was asked about her victim-impact statement regarding the defendant's previous employers. Over defense objection, she explained that after firing the defendant she had spoken personally with Joyce Andrews, the owner of one of the real estate companies. In checking the defendant's references, Ms. Ligon-Hughes had questioned Ms. Andrews' office manager. The office manager had been concerned about being sued and did not disclose the problems with the defendant. When, however, Ms. Ligon-Hughes talked with Ms. Andrews, Ms. Andrews related that the defendant had been fired after using a company credit card to order personal merchandise, such as dolls. The other real estate company owner would not provide specifics but simply told Ms. Ligon-Hughes that the defendant "doesn't know what honesty is."

Ms. Ligon-Hughes disputed the defendant's testimony about when the embezzlement stopped. Ms. Ligon-Hughes testified that the defendant was writing checks up until the time she was fired in August 1999 and that, in all, the defendant had written at least 250 unauthorized checks. In addition to the purchases already mentioned, Ms. Ligon-Hughes testified that the defendant had acquired a new pickup truck for her family and was making payments on the vehicle from stolen proceeds.

Ms. Ligon-Hughes testified that she was certain that the defendant embezzled more than $133,000, but that amount was all that could be readily documented. As she did in her victim-impact statement, Ms. Ligon-Hughes explained how the defendant's theft led to the collapse of the real estate company and all of the other attendant problems.

At the conclusion of Ms. Ligon-Hughes's testimony, the court solicited statements from counsel. The defendant's counsel implored the court to consider a sentence less than full incarceration on the basis of providing restitution to Ms. Ligon-Hughes. The state sought incarceration and pointed out: (1) the theft was not an isolated event but a continuing course of conduct; (2) providing necessities for her family was a minor aspect of the defendant's theft; (3)

"with the stroke of a pen and a punch of a few buttons," the defendant destroyed Ms. Ligon-Hughes's life, her family's life, her business, and the lives of people who had worked for the real estate company; (4) the defendant's sincerity about making restitution was highly doubtful inasmuch as she had remained unemployed since being fired and had shown absolutely no interest in making any restitution in the five years following her termination; and (5) alternative sentencing "would absolutely depreciate" the damage that the defendant had inflicted.

The trial court began its ruling by noting the "terrible damage" that the defendant had "reeked" and the lives that had been destroyed. Next, the trial court found the defendant's explanation why she had embezzled the money to be untruthful, although the court granted the defendant the benefit that she may have started embezzling funds to pay for family necessities. After a short while, however, the defendant "went wild buying things" and dipping into "a free well of money," according to the trial court. The court was very troubled by the defendant's failure to make any restitution over the preceding five years and not obtaining employment, and the court believed that probation or other alternative sentencing would depreciate the seriousness of the offense. Finally the court referenced the need for deterrence. Accordingly, the court ordered an incarcerative sentence of eight years as a Range I standard offender.

On appeal, the defendant registers three sentencing complaints. First, she insists that the trial court erred in allowing Ms. Ligon-Hughes to testify about what the defendant's former employers had said. Second, the defendant argues that she should have been granted probation. Last, she maintains that the trial court acted in contravention of public policy by failing to impose a community corrections sentence. We will consider each contention in turn.

## I. Hearsay Statements

As previously noted, after terminating the defendant's employment, Ms. Ligon-Hughes sought out two of the defendant's previous employers. Over defense objection, the trial court permitted Ms. Ligon-Hughes to relate her conversations with those employers during which one employer advised that the defendant was fired for making personal purchases with a company credit card and during which the other employer characterized the defendant as not "know[ing] what honesty is." The defendant argues that the trial court should never have permitted such inadmissible and prejudicial hearsay. From the defendant's brief, we are uncertain what relief or remedy she seeks from the alleged erroneous admission; she simply claims that her sentencing hearing was flawed. For its part, the state contends that any error was clearly harmless.

Tennessee's sentencing scheme allows for the admission and consideration of trustworthy and probative evidence. *See* Tenn. Code Ann. § 40-35-209(b) (2003). "Reliable hearsay is admissible in a sentencing hearing so long as the opposing party has a fair opportunity to rebut the evidence." *State v. Moss*, 13 S.W.3d 374, 385 (Tenn. Crim. App. 1999). We are not persuaded that the hearsay statements at issue in this case were necessarily untrustworthy or unreliable. Furthermore, we do not believe that the defendant was deprived of a fair opportunity to rebut the evidence or confront the prior employers. The defendant admitted in her sentencing testimony that

she had read and was aware of the hearsay statements from the victim-impact report; she countered the hearsay by denying involvement with any dishonesty in her former employment. Moreover, the defendant did not call her former employers to testify, nor did she request a continuance to subpoena the employers once the trial court overruled her hearsay objection.

Regardless whether it was error to admit the hearsay statements, we agree with the state that admission of the evidence was harmless. The trial court did not rely upon or allude to the statements attributed to the defendant's former employers in sentencing the defendant. In addition, the defendant's dishonesty/untruthfulness was independently established. The trial court specifically found that the defendant had been untruthful in claiming that she used the embezzled money to resolve family financial problems, in light of the many extravagant and frivolous purchases made. The defendant's testimony that she had ceased her larcenous behavior months before her thefts were discovered was flatly contradicted by Ms. Ligon-Hughes's sworn insistence that the defendant was writing checks up until the time she was fired in August 1999. The trial court had abundant grounds to assess the defendant's credibility, which were unrelated to any comments by the defendant's former employers.

Accordingly, we reject the defendant's argument.

## II. Alternative Sentencing

Regarding the defendant's remaining two sentencing issues, we begin with our familiar standard of review. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see State v. Hooper*, 29 S.W.3d 1, 5 (Tenn. 2000). "The burden of showing that the sentence is improper is upon the appellant." *Ashby*, 823 S.W.2d at 169. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id*. If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989. At the conclusion of the sentencing hearing, the trial court determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code

Ann. §§ 40-35-210(a), (b), -35-103(5) (2003); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

### A. Probation

The defendant argues strenuously that she should have received a probationary sentence. In support, she advances a "presumption of rehabilitation" and lack of significant criminal history, and she attacks the trial court's reliance on deterrence and seriousness of the offense. To be sure, the defendant was eligible for probation, having received an eight-year sentence. *See* Tenn. Code Ann. § 40-35-303(a) (2003). However, the determination of entitlement to full probation necessarily requires a separate inquiry from that of determining whether a defendant is entitled to a less beneficent alternative sentence. *See State v. Bingham*, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). A defendant is required to establish her "suitability for full probation as distinguished from [her] favorable candidacy for alternative sentencing in general." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see Bingham*, 910 S.W.2d at 455-56. A defendant seeking full probation bears the burden of showing that probation will "subserve the ends of justice and the best interest of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

As contrasted with the defendant's eligibility for probation in this case, she was not, as a matter of law, entitled to the presumption of favorable candidacy for alternative sentencing that is extended to an offender who is "an especially mitigated or standard offender convicted of a Class C, D or E felony." *See* Tenn. Code Ann. § 40-35-102(6) (2003). The defendant stands convicted of a Class B felony. "As such, the state had no burden of justifying confinement through demonstrating the presence of any of the considerations upon which confinement may be based [per Tennessee Code Annotation section 40-35-103(1)]." *State v. Joshua L. Webster*, No. E1999-02203-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Knoxville, Dec. 4, 2000); *see State v. Zeolia*, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996) (when presumption of favorable candidacy for alternative sentencing options applies, state must justify confinement by showing "evidence to the contrary" of the presumption).

The defendant's reference to a presumption of rehabilitation confuses the proverbial apples and oranges. The presumption-of-rehabilitation concept was given voice in *State v. Ashby*, 823 S.W.2d 166 (Tenn. 1991), in connection with discussing section 40-35-102(5). Therein the supreme court wrote, "Also, subsection (5) establishes a rebuttable presumption in favor of rehabilitation upon early convictions. *See also* T.C.A. § 40-35-303(b) (probation is to be automatically considered as a sentencing alternative for eligible defendants). . . ." By that language, we do not believe that the supreme court intended to relieve a defendant of his or her burden to demonstrate suitability for full probation by invoking a rehabilitation presumption that the state would then be required to rebut. Instead, we read the court's language as referring to the statutory requirement that "probation shall be *automatically considered* by the court" for eligible defendants. *See* Tenn. Code Ann. § 40-35-303(b) (2003) (emphasis added). This interpretation is reinforced by

Code section 40-35-303(b), which also expressly provides "that nothing in this chapter shall be construed as altering any provision of present statutory or case law requiring that the burden of establishing suitability for probation rests with the defendant." *Id.* § 40-35-303(b).

Regarding considerations relevant to probation, the trial court is directed to consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, his or her present condition, including physical and mental condition, and the deterrent effect on the defendant. *See State v. Kendrick*, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the appropriate sentence. *See* Tenn. Code Ann. § 40-35-103(5) (2003).

We discern no reason to disturb the trial court's determination that the defendant failed to show entitlement to probation. Although the defendant admittedly lacked a significant criminal history, her amenability to rehabilitation was not demonstrated.

Furthermore, it is settled that a trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. *See State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *see also State v. Bunch*, 646 S.W.2d 158, 160-61 (Tenn. 1983); *Zeolia*, 928 S.W.2d at 463. The trial court was obviously not impressed with the defendant's candor regarding the extent of and motivation for the theft, and that credibility determination is entitled to great deference.

As for the trial court's conclusion that confinement was appropriate, we emphasize that the state was not burdened with the task of establishing the propriety of confinement. *See Joshua Webster*, slip op. at 3. At any rate, the defendant blatantly abused a position of trust by engaging in an ongoing scheme of embezzlement; the defendant's conduct was not an isolated event but, instead, a continuing course of misconduct. *See State v. Tony Harp*, No. W2003-01655-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Jackson, Sept. 21, 2004) (full probation inappropriate based on abuse of position of trust and ongoing scheme to defraud business). The enormity of the defendant's theft led to the financial ruin of Ms. Ligon-Hughes's real estate company, thereby affecting the lives of several people. The defendant destroyed Ms. Ligon-Hughes's ability to retire and robbed her of precious time and resources to devote to family members.

Regarding deterrence, we note that the trial court did not rely solely on that ground as a basis for denying probation in this case. Consequently, it is unnecessary to engage in any protracted analysis whether sufficient evidence exists in the record relating to the need for deterrence. *See generally State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In summary, we discern no error in the trial court's refusal to probate the defendant's eight-year sentence in this case.

### B. Community Corrections

As for the final issue that the defendant raises, we find no basis to credit her argument that the trial court "acted in contravention of the public policy" of Tennessee by failing to impose a community corrections sentence.

A community corrections sentence is a form of alternative sentencing. *See* Tenn. Code Ann. § 40-35-104(c)(9) (2003). As noted previously, the defendant is not entitled to a presumption of entitlement to alternative sentencing because she was convicted of a Class B felony. Although the defendant does meet the minimum eligibility criteria listed in Code section 40-36-106, mere eligibility does not automatically entitle her to be sentenced under the community corrections program. *See State v. Ball*, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998).

"The Community Corrections Act was never intended as a vehicle through which offenders could escape incarceration." *State v. Grigsby*, 957 S.W.2d 541, 547 (Tenn. Crim. App. 1997). In that respect, a trial court may consider, *inter alia*, a defendant's candor or untruthfulness in denying a community corrections sentence. *See Zeolia*, 928 S.W.2d at 463. In our opinion, the trial court's negative assessment of the defendant's candor provides ample support for an incarcerative sentence in lieu of community corrections.

In summary, the defendant has failed to carry her burden of demonstrating that the sentence imposed by the trial court was improper, and the judgment of the trial court is, accordingly, affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE