IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 18, 2009, Session

## STATE OF TENNESSEE v. WILLIAM EDWIN HARRIS

**Direct Appeal from the Circuit Court for Grundy County
No. 4387   Thomas W. Graham, Judge**

**No. M2008-01685-CCA-R3-CD- Filed June 30, 2009**

The Defendant, William Edwin Harris, pled guilty to two counts of aggravated statutory rape, a Class D felony, with an agreed sentence of three years on each count, to be served consecutively, for an effective sentence of six years. The manner of service of the sentences was to be determined by the trial court following a sentencing hearing. The trial court ordered the Defendant to serve the first three-year sentence in the Tennessee Department of Correction ("TDOC"), with the last three-year sentence to be served on probation. The Defendant appeals, contending: (1) the trial court erroneously admitted several victim impact statements during his sentencing hearing; and (2) the trial court erred when it denied him full probation. After a thorough review of the record and relevant authorities, we conclude the victim impact statements were properly admitted, and the trial court properly sentenced the Defendant. Accordingly, we affirm the judgments of the trial court

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Robert Morgan (at guilty plea and sentencing hearings), Jasper, Tennessee, and Philip A. Condra (at sentencing hearing and on appeal), Jasper, Tennessee, for the Appellant, William Edwin Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lacy Wilber, Assistant Attorney General; J. Michael Taylor, District Attorney General; Steven Strain, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the Defendant's rape of a thirteen year old female, B.W.,[1] and a fifteen year old female, A.H. According to the Defendant's plea hearing transcript, the State's proof would have shown that B.W. and A.H. stayed overnight with the Defendant, a thirty-five year old family friend, on December 22, 2006, and that, during this time, the Defendant sexually penetrated each victim. The Defendant pled guilty to two counts of aggravated statutory rape and agreed to consecutive three-year sentences, with the trial court to determine the method of service of his sentence.

Before the Defendant's sentencing hearing, the State filed a presentence report, which included A.H. and B.W.'s victim impact statements, as well as victim impact statements from A.H.'s parents and B.W.'s mother. The Defendant moved to strike these statements from the presentence report, and the trial court orally denied this motion during the sentencing hearing. The presentence report contained an investigation report, statements from the victims, statements from the victims' parents, and several statements from the Defendant.

The investigation report indicated that the Defendant, who was thirty-six years old at the time of sentencing, had no history of criminal conduct. After graduating from high school in 1990, the Defendant enlisted in the Tennessee National Guard and was deployed to Iraq for one year during the Desert Storm War. Following his deployment, the Defendant began to experience post-traumatic stress disorder ("PTSD"), for which he received counseling once every three months. The Defendant also suffered from irritable bowl syndrome ("IBS"), for which he took medication. The Department of Veterans Affairs declared the Defendant thirty percent disabled due to his PTSD and IBS. In 2002, the Defendant received an honorable discharge from the military.

The Defendant stated to the officer preparing the investigation report that he attended Chattanooga State Technical Community College at some point after high school, but the officer could not confirm this enrollment. The officer confirmed, however, that the Defendant attended Motlow State Community College from 2007 to 2008. The Defendant never obtained a college degree.

The Defendant did not report any employment between his 2002 honorable discharge and 2007. In 2007, the Defendant worked for six months as a front desk clerk at a hotel. In 2008, he worked in the shipping and receiving department of Tennessee Galvanizing for three weeks. At the

---

1. It is the policy of this Court to refer to child victims of sexual offenses by their initials.

time of the sentencing hearing, the Defendant worked as a general laborer at the residence of Jerene Fuller in Tracy City, Tennessee.

The Defendant had a minor son of whom he had full custody before he was charged with the victims' rapes. At the time the report was prepared, the Defendant's son was in the custody of his son's maternal grandmother, to whom the Defendant said he paid $250 a month in child support. Although the Defendant first stated his son's mother was not involved in their son's life, he later stated she visited their son on weekends.

The presentence report included victim impact statements from the victims and their parents. In her victim impact statement, A.H. said that after the rape she feared and distrusted all men, including her father, and she always felt as though someone watched her when she slept. A.H. stated that she suffered from nightmares about the rape and that she cried every time she thought of the rape. Also, A.H. developed a vaginal infection after the rape. At the time the report was prepared, A.H. was receiving counseling at school, and a case manager regularly visited her at her home. A.H. reported feeling depressed and having suicidal thoughts after the rape.

A.H.'s mother contributed a statement to the report wherein she described how her daughter became increasingly "withdrawn, hostile, and depressed" after the rape. A.H.'s mother alluded to the Defendant's having threatened to kill A.H. and her family if she reported the rape, saying that this threat caused A.H. to become suicidal and to fear leaving her home. A.H.'s mother believed the stress of her daughter's attack caused A.H.'s father to suffer two heart attacks. A.H.'s mother felt guilty for having introduced the Defendant, a fellow Motlow State student, to her daughter. She said she experienced increased depression and anxiety after her daughter was raped. A.H.'s mother said she feared the Defendant and requested the court incarcerate him so that she could have her "fun, loving, happy go lucky little girl back."

A.H.'s father's statement confirmed that, after the rape, A.H. feared leaving her house for school because she believed the Defendant would kill her while she waited for her bus. He reported the rape destroyed his relationship with his daughter, explaining that his daughter no longer confided in him and avoided physical contact with him. He confirmed the stress from his daughter's rape had caused a decline in his health.

According to B.W.'s victim impact statement, B.W. also became scared and distrustful of men after the rape. Also, B.W. feared she was pregnant and developed a vaginal infection after the rape. In addition to receiving counseling for the rapes, B.W. entered a mental health facility for approximately a month in January and February 2008 and, at the time of sentencing, was attending anger management classes. She stated the rape affected the way she felt about herself, causing her to have low self-esteem.

3

B.W.'s mother also contributed a statement to the presentence report. She described how the rape turned her previously "sweet and innocent little girl" into a "bitter and hateful person," who now frequently became angry, threw things, cursed, and threatened to kill herself. She also said that B.W. received Ds and Fs in school, whereas before being raped she was on the honor roll. She confirmed that the emotional trauma B.W. experienced from the rape caused B.W. to be admitted into a mental health facility. B.W.'s mother said the Defendant's threats caused her to fear for her and her daughter's safety, which had triggered several recent panic attacks.

The presentence report also included several statements from the Defendant about the rapes. He claimed the victims pressured him to engage in sexual activities, saying "these girls came on to me." The Defendant described in detail his sexual contact with the victims. During his plea hearing, the Defendant denied he threatened to harm either the victims or their families in the event the victims reported being raped.

At the sentencing hearing, Captain Tony Bean of the Grundy County Sheriff's Department testified that A.H., B.W., and their mothers came to the Sheriff's Department and reported that the Defendant had engaged in sexual intercourse with each of the victims. Captain Bean separated the victims and each victim wrote an account of the Defendant's behavior between December 22 and December 26, 2006. He said the Defendant voluntarily gave the statements within the presentence report over the course of three different interviews.

On cross-examination, Captain Bean explained his department interviewed the Defendant three times. First, he along with other officers visited the Defendant at his home, where the officers interviewed the Defendant and examined his house. After this initial interview, the Defendant came to the police station twice and submitted additional statements. Captain Bean testified that the Defendant appeared very nervous during their interviews but cooperated. On re-direct examination, the captain stated that officers neither added nor paraphrased the victims' statements and that, thus, their statements were in "their language only."

Amanda Fults, the Defendant's girlfriend at the time of the hearing, testified that she had known the Defendant since they were children and that she knew the Defendant had been charged with the victims' rape when she entered into a romantic relationship with him in April 2007. Fults and the Defendant lived together at the time of the hearing. She testified the Defendant had attended Motlow State Community College throughout their relationship, but he dropped out shortly before the hearing. Fults said that, since losing custody of his son, the Defendant visited his son every Sunday and that, despite the tension brought by the criminal charges, his son "[could not] wait to be with his dad." She said the Defendant consistently paid his mother-in-law $204 a month in child support.

Fults testified she received her income from operating a trucking business with her mother and from cleaning houses. Fults and the Defendant both worked for Jerene Keller, with Fults

4

cleaning Keller's house and the Defendant maintaining Keller's property. Fults testified that, while she and the Defendant shared the household bills, the Defendant contributed financially more than she did. Fults had observed the effects of PTSD upon the Defendant, which consisted chiefly of mood swings. She said the Defendant took medication to treat his PTSD and regularly attended counseling sessions, though he was between counselors at the time of the hearing. Fults testified the Defendant was "one of the most helpful people [she had] ever seen," relating that recently the Defendant, having come upon a wreck, checked on the victims and directed traffic until police arrived. She also said the Defendant attended church regularly, whereas she did not.

On cross-examination, Fulks testified the Defendant told her the victims stayed with him with their parents' permission, but he did not tell her he had sexual contact with either victim. She acknowledged the impropriety of a thirty-five year old man having sexual contact with a thirteen-year-old girl, saying she did not condone such contact, but she expressed that the Defendant had treated her mother, her grandmother, and herself well. She explained that she and the Defendant lived in the trailer she used to share with her ex-husband and that her ex-husband continued to make the payments on the trailer pending a bankruptcy action stemming from their divorce. The Defendant paid the trailer's utilities bills, his $350 truck payment, and his $204 child support payment each month.

Fults indicated she was aware that the Defendant had several different employers within the year before the hearing, saying Tennessee Galvanizing laid off the Defendant, but the Defendant quit his job at American Eagle Inn. Fulks explained the Defendant's present employer, Keller, was a family friend. According to Fulks, Keller paid the Defendant ten dollars an hour to work at her residence and informed the Defendant he could have work "any time he wanted it." Fulks knew the Defendant worked fewer than forty hours a week for Keller and had no other employment.

Jerene Keller testified at the Defendant's sentencing hearing and described her employment relationship with the Defendant. She testified she was unable to work, explaining that polio had confined her to a wheelchair when she was five years old. Keller testified her income derived from independent assets, which she planned to use to open a canine rescue and training facility on her property. Keller enlisted the Defendant's aid in preparing for the facility, and she said the Defendant mowed her lawn, cleaned up the grounds, constructed platforms for the doghouses, installed plants, and cared for her dogs. She estimated the Defendant spent about five hours a day on her ten-acre property, for a total of twenty to twenty-five hours a week. Keller confirmed the Defendant had a good work ethic and described him as "very cooperative."

Sheila Nunley testified she had been friends with the Defendant since they worked at a retirement home together in 1992. She described the Defendant as "very helpful" to her family, saying that the Defendant frequently drove her and her mother to Nashville so that her mother could attend doctor appointments. Nunley said her son was injured in four-wheeler wreck in September 2005, and the Defendant frequently drove Nunley to and from Chattanooga, where her son was

hospitalized. At some point, the Defendant's vehicle became inoperable, and the Defendant was unable to obtain financing for a new vehicle. Nunley testified that, in consideration of the Defendant's kindness, she "signed for a truck in [her] name" for the Defendant. She said the Defendant consistently paid the monthly $353.55 truck payment, and he had always been very helpful to her family and had never displayed any violence.

On cross-examination, Nunley said she was aware the Defendant had pled guilty to raping two minor victims but insisted this knowledge did not affect her opinion of the Defendant because he had "been good" to her family. Nunley said the Defendant had not discussed with her the details of his sexual contact with the victims.

The Defendant then gave an allocution in which he issued an apology and asked the trial court to grant him probation so that he could regain custody of his son:

> First of all, Your Honor, Mr. District Attorney, and the Court, I want to say–and to the family–how sorry I am. I never meant to hurt anyone.

> And [Y]our Honor, if the Court will grant mercy upon me to give me probation I'll do my best to turn everything around. I have responsibilities for my son. He's now in the custody of someone else and I want to try to work [on] getting him back. He needs me. I'm the only parent right now that's in his life. I have responsibilities with these ladies here and I am responsible. I do work and I do go through counseling and will seek more if it pleases the Court.

> I have served my country and I have an honorable discharge and I ask the Court to show me mercy. Thank you.

At the conclusion of the hearing, the trial court sentenced the Defendant in Count I to three years for the aggravated statutory rape of B.W. and in Count V to three years for the aggravated statutory rape of A.H., with the sentences to be served consecutively, for a total effective sentence of six years. The trial court ordered the Defendant to serve the three-year sentence for Count I in the TDOC, with the last three-year sentence for Count V to be served on probation. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant appeals his sentence, contending: (1) the trial court erroneously admitted several victim impact statements during his sentencing hearing; and (2) the trial court erred when

6

it denied him full probation.

## A. Admission of Victim Impact Statements

The Defendant objects to the admission of the impact statements from his victims, who did not testify, at his sentencing hearing. The Defendant argues that, without an opportunity to cross-examine the victims at the sentencing hearing, the introduction of their statements violated his United States and Tennessee State Constitutional rights to confront any witness who testifies against him. The State responds that, as a defendant's confrontation right does not extend to his sentencing hearing, the trial court properly admitted the statements because the statements were reliable, and the Defendant had an opportunity to rebut the statements.

The Sixth Amendment to the United States Constitution provides criminal defendants the right to confront adverse witnesses. The admission of testimonial hearsay at trial, without a showing of unavailability and an opportunity to cross-examine, generally violates a defendant's right to confront adverse witnesses. *Crawford v. Washington*, 541 U.S. 36, 50 (2004). A broad consensus exists that the confrontation clause of the U.S. Constitution does not apply, however, to the evidence adduced during sentencing. *See, e.g., U.S. v. Fields*, 483 F.3d 313, 326 (5th Cir. 2007); *also see State v. Stephenson*, 195 S.W.3d 574, 590 (Tenn. 2006) (citing *Williams v. New York*, 337 U.S. 241 (1949)). In fact, the Sixth Circuit Court of Appeals held that *Crawford* did not alter the previous rule that the confrontation clause does not apply to sentencing. *United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005). Thus, the U.S. Constitution is no barrier to the admission of hearsay during the penalty phase of a state criminal trial. As such, if any protection from hearsay during sentencing exists, it must derive from Tennessee state law.

The Defendant contends the Tennessee Constitution protects against the admission of victim impact statements during a sentencing hearing. Indeed, the Tennessee Constitutional right to confront adverse witnesses is, in some aspects, broader than its federal counterpart. Tenn. Const. art. I, § 9; *See State v. Deuter*, 839 S.W.2d 391, 395 (Tenn. 1992) (holding that the Tennessee Constitution requires *actual* "face to face" confrontation). Even Tennessee's comparably broad confrontation right, however, does not apply to a sentencing hearing. *Stephenson*, 195 S.W.3d at 590 (citing *State v. Smith*, 857 S.W.2d 1, 23 (Tenn. 1993)). Because the Tennessee Constitutional confrontation right applies only to the guilt phase of a trial, the only protection in Tennessee against the introduction of testimonial hearsay during sentencing derives from the Tennessee Code. *Id*.; *see State v. Moss*, 13 S.W.3d 374, 385 (Tenn. Crim. App. 1999).

Tennessee Code Annotated section 40-35-209(b) (2006) provides that reliable hearsay may be admitted at sentencing if the adverse party has an opportunity to rebut the hearsay. *See Moss*, 13 S.W.3d at 385. Applying section 209(b) to the admission of victim impact statements during sentencing, this Court has held that, where a trial court fails to explicitly find hearsay is reliable, an

officer's inclusion of the hearsay within a sentencing report operates to verify the hearsay's reliability. *State v. Bobby Garner*, No. M1999-01427-CCA-R3-CD, 2000 WL 1681022, *3 (Tenn. Crim. App., at Nashville, Nov. 9, 2000), *no Tenn. R. App. P. 11 application filed*.

Further, we note that the Tennessee Code explicitly authorizes the inclusion of victim impact statements in a defendant's presence report, which would be introduced during the defendant's sentencing hearing. T.C.A. § 40-38-205 (2006). This provision does not, as the Defendant suggests, violate either the United States or the Tennessee Constitution because, as discussed above, neither constitution restricts the introduction of hearsay during the penalty phase of a trial. *Stone*, 432 F.3d at 654; *Stephenson*, 195 S.W.3d at 590.

As the admission of hearsay during sentencing violates no constitutional protections, the victims' statements included in the Defendant's presence report did not violate his constitutional rights to confront adverse witnesses. *Fields*, 483 F.3d at 326; *Williams*, 337 U.S. 241; *Stephenson*, 195 S.W.3d at 590. Further, the Tennessee Code explicitly authorizes the introduction of the victims' statements during the Defendant's sentencing hearing. T.C.A. § 40-35-205. Free from constitutional constraint and explicitly authorized by statute, the statements are subject only to the Tennessee Code's restriction on the particular form, hearsay, in which the State introduced them. Because the State entered the statements as hearsay, section 209(b) of the Tennessee Code requires they be reliable and the Defendant have an opportunity to rebut the statements. T.C.A. § 40-35-209(b); *Moss*, 13 S.W.3d at 385.

Another panel of this Court, however, declined to recognize a victim's mother's statement as "reliable hearsay" under section 209(b) based only on the statement's inclusion in the defendant's presence report:

> [T]his court has generally deemed the information included within presence reports such as the defendant's prior criminal record, employment information, and the like as reliable hearsay, this designation would not extend to the underlying hearsay contained within the victim's mother's statement. Because the record does not establish the reliability of the underlying hearsay statement, we will not consider it.

*State v. Donald Blevins*, No. E2007-01588-CCA-R3-CD, 2008 WL 3906081, *5 (Tenn. Crim. App., at Knoxville, Aug. 26, 2008), *no Tenn. R. App. P. 11 application filed*. We note that the trial court in *Blevins* relied upon the victim's mother's hearsay statement included in the presence report as evidence of the circumstances of the offense, and it used the hearsay statement as the sole basis for denying Blevins a probated sentence. *Id*. at *2.

8

Unlike in the *Blevins* case, we are satisfied in this case that the victims' impact statements are reliable. The statements address the impact of the crimes upon the lives of the minor victims. Based on the circumstances of the crimes to which the Defendant pled guilty, it is difficult to imagine that these child victims would not have been negatively affected by the crimes. The specifics of the sexual contact between the Defendant and the two children is set out in the statements of the Defendant and was noted a the hearing on the Defendant's guilty plea. Both of the victim impact statements are consistent with the statements given by the parents of the victims. Finally, a probation officer included them in the Defendant's presentence report, thereby verifying their source. *See Garner*, 2000 WL 1681022, *3.

Concerning the Defendant's opportunity to rebut the statements, the Defendant received notice of the victim impact statements almost eight months before his sentencing hearing, when the State filed the presentence report containing the statements. Obviating his knowledge of the statements' existence and content, the Defendant moved to strike the statements two days before his sentencing hearing. The court denied this motion, and, during the sentencing hearing, the Defendant presented testimony from his girlfriend, a long-time acquaintance, and his employer, that the Defendant was a non-violent, loyal, trust-worthy man, which directly contrasted the victim impact statements' portrayal of the Defendant. In our view, the Defendant not only had an opportunity to rebut the victim impact statements but also took advantage of this opportunity and presented evidence rebutting the statements. Having determined that the victims' impact statements complied with the Tennessee Code's restrictions on hearsay admitted during sentencing, we conclude the trial court properly admitted the statements during the hearing. The Defendant's constitutional rights were not violated. The Defendant is not entitled to relief on this issue.

## B. Method of Service

The Defendant contends the trial court erred when it ordered him to serve three years of his sentence in the TDOC, arguing the trial court failed to consider the relevant sentencing principles and factors. The State concedes the trial court erred in applying deterrence as its sole reason to deny probation and that de novo review is necessary. The State maintains, however, that the circumstances of the victims' rapes, the Defendant's lack of potential for rehabilitation, and the need to avoid unduly depreciating the seriousness of statutory rape, nonetheless justify the Defendant's three-year term of imprisonment in Count I.

When a defendant appeals the manner of service of a sentence imposed by a trial court, this court conducts a de novo review of the record with a presumption of correctness as to the trial court's determination. T.C.A. § 40-35-401(d) (2005). However, this presumption of correctness arises only if the record affirmatively shows that the trial judge considered both the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party carries the burden of showing the sentence is improper. T.C.A. § 40-35-401(d), Sentencing Comm'n Cmts. Even if we prefer a different result, we may not disturb the sentence if

the trial court followed the statutory sentencing procedure, made findings of fact adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The Tennessee Supreme Court noted recently that, due to the 2005 sentencing amendments, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing T.C.A. § 40-35-102(6) (2006)). While a presumption no longer exists, an especially mitigated or standard offender convicted of a Class C, D, or E felony is still considered a "favorable candidate" for alternative sentencing in the absence of evidence to the contrary. *Id.* Generally, defendants classified as Range II or Range III offenders are not to be considered as favorable candidates for alternative sentencing.[2] T.C.A. § 40-35-102(6); 2007 Tenn. Pub. Acts 512. Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall *consider*" them. T.C.A.§ 40-35-102(6) (emphasis added).

If a defendant seeks probation, then that defendant bears the burden of "establishing [his] suitability." T.C.A. § 40-35-303(b) (2006). As the Sentencing Commission points out, "even though probation must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303 (2006), Sentencing Comm'n Cmts.

When sentencing the defendant to confinement, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103 (2006). Our Supreme Court has held, however, that a denial of full probation may be based on deterrence alone in only limited circumstances. *Hooper v. State*, 29 S.W.3d 1, 13 (Tenn. 2000). In order for deterrence to serve as the sole basis for a denial of full probation, the record must contain evidence that would lead a reasonable person to conclude not only that deterrence is needed in the community, jurisdiction, or state but also that the defendant's incarceration may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes. *Id.*

---

[2] The legislature did carve out an exception to this rule where if "a defendant with at least three (3) felony convictions is otherwise eligible, such a defendant may still be considered a favorable candidate for any alternative sentencing that is within the jurisdiction of and deemed appropriate by a drug court." 2007 Tenn. Pub. Acts 512.

In determining whether to impose confinement, the trial court may also consider the mitigating and enhancment factors set forth in T.C.A. sections 40-35-113 and 114. T.C.A. § 40-35-210(b)(5); *State v. Boston*, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining whether an alternative sentence would be appropriate. T.C.A. § 40-35-103(5); *Boston*, 938 S.W.2d at 438.

In conducting de novo review of a sentencing determination, we must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the offense, (5) any mitigating or enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses; and (7) any statements made by the defendant on his or her own behalf. *See* T.C.A. § 40-35-210 (2006); *State v. Foster*, No. W2007–02636-CCA-R3-CD, 2009 WL 275790, *4 (Tenn. Crim. App., at Jackson, Feb. 3, 2009), *no Tenn. R. App. P. 11 application filed*.

To meet the burden of establishing suitability for full probation, a defendant must demonstrate that full probation will serve the ends of justice and the best interests of both the public and the defendant. *State v. Blackhurst,* 70 S.W.3d 88, 97 (Tenn. 2001). The following criteria, while not controlling the discretion of the sentencing court, shall be accorded weight when deciding the defendant's suitability for full probation: (1) the nature and circumstances of the criminal conduct involved; (2) the defendant's potential or lack of potential for rehabilitation; (3) whether a sentence of full probation would unduly depreciate the seriousness of the offense; and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. T.C.A. §§ 40-35-103(1)(B), -103(5), -210(b)(4) (2003); *see also Blackhurst,* 70 S.W.3d at 97.

In the case under submission, the Defendant is eligible for full probation because his sentence is ten years or less. T.C.A. § 40-35-303(a) (2006). Although full probation must be automatically considered by the trial court as a sentencing alternative whenever the defendant is eligible, "the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b), Sentencing Comm'n Cmts.

In the case under submission, at the conclusion of the Defendant's sentencing hearing, the trial court explained that it would deny full probation in order to deter statutory rape:

> Well, this particular crime is more significant maybe than other crimes, because it deals with children who don't have . . . the same defenses and judgments and things and that's why it is a crime to begin with, but it is a significant offense, and meant so by the [S]tate [L]egislature when they made it a D felony. It's one of those offenses that if . . . punishment creates deterrence, which sometimes is

11

questionable in some kinds of crimes, this might be the very kind of crime where punishment would have value, that is in confinement, because there is some ability of an adult to think about what they're doing before they get [them]selves into a situation of sexual activity. More so even in cases of assault and murder and everything else. There's no real reason why a person can't calculate their situation when they're with a possible sexual activity with children, so it seems to me like that in this case that subsection (b) does have application and should have some significance. In other words, I don't believe this is a case for straight probation.

. . . .

I really probably was leaning more towards just complete confinement . . . in this case. I don't really see much excuse here. I just see what amounts to allowing a person's sexual gratifications to be fulfilled in some way with small children. That's the only way you can read this.

After explaining its finding that deterrence justified denial of full probation, the trial court sentenced the Defendant to three years of incarceration followed by three years of probation. In response to defense counsel's objection to the court's reliance on deterrence, the trial court said:

I am very sure that my sentence of incarceration or confinement for one of two offenses, based on the need for deterrence of this particular crime, because if there's anything that needs deterrence it's adults taking advantage of children, but I think that's very strong and I don't think it's going to be set aside . . . .

Therefore, the trial court denied full probation citing only the deterrent effect of incarcerating the Defendant.

As explained above, a trial court may base a denial of probation on deterrence alone only if the record contains evidence a particular need for deterrence exists in the community and the defendant's incarceration may rationally serve as a deterrent to other similar defendants. *Hooper*, 29 S.W.3d at 13. As to whether a need to deter statutory rape exists in the Defendant's community, the trial court only emphasized that statutory rape was "more significant . . . than other crimes, because it deals with children who don't have . . . the same defenses and judgments." As to whether the Defendant's incarceration would rationally deter like offenders, the trial court asserted that a statutory rapist's unique opportunity to choose not to have sexual contact with a minor once the rapist becomes aware of the victim's age makes statutory rape ripe for deterrence. These assertions, unsupported by extrinsic evidence, are insufficient to demonstrate a particular community need for deterrence of statutory rape and a rational relationship between the Defendant's incarceration and such deterrence, as *Hooper* requires. *Id.* We conclude the trial court erred when it sentenced the Defendant, and we will not presume its order denying probation to be correct. *See* T.C.A. § 40-35-401(d); *Ashby*, 823 S.W.2d at 169. We will review the Defendant's sentence de novo on the record.

12

In conducting our de novo review of his sentence, we note first that the Defendant is a Range I (standard) offender. Therefore, he is entitled to "favorable consideration" for an alternative sentence. *See* T.C.A. § 40-35-102(6). Furthermore, as discussed above, the record does not show a community need for deterrence and, because the Defendant has no prior criminal record, measures less restrictive than confinement have not heretofore been applied to the Defendant. *See* T.C.A. § 40-35-103. Therefore, none of the considerations set forth in T.C.A. section 40-35-103 preclude imposition of some form of alternative sentencing for the Defendant's six-year sentence. *See* T.C.A. § 40-35-103(1)-(3). We must consider whether full probation, however, is appropriate for the Defendant and the public. *Blackhurst*, 70 S.W.3d at 97.

Several aspects of the case under submission suggest that full probation of the Defendant's sentence would serve neither the ends of justice nor the best interests of the public and the Defendant. *See Id*. First, according to the Defendant's own statements, the Defendant had sexual contact with the victims on two distinct occasions: December 22, 2006, and December 26, 2006. Also, all parties agreed that the Defendant raped the victims after the victims were placed in the Defendant's care by their respective mothers, whom the Defendant knew from school. As such, in our view, the Defendant used the position of trust he enjoyed with the victims' mothers to exploit the victims. This aspect of the Defendant's conduct suggests total probation is inappropriate. *See* T.C.A. § 40-35-210(b)(4); *see also Blackhurst*, 70 S.W.3d at 97. Moreover, the record is replete with references to the Defendant's threats of violence to the victims and their families in the event they reported his conduct. The Defendant denied these threats. In our de novo review of the record, the Defendant's threats further cast doubt upon the Defendant's suitability for probation.

Further, the Defendant's lack of remorse for the victims' rapes strikes this Court as indicative of the Defendant's lack of potential for rehabilitation. *See* T.C.A. § 40-35-103(5). Before the Defendant was charged with the victims' rapes, he gave several statements to police about his sexual contact with the victims. In these statements, the Defendant assigned blame for the sexual contact on the victims, alleging, "These girls came on to me, not me coming on to them." Because the fact that the Defendant, who was thirty-five years old, had sex with the victims, who were thirteen and fifteen years old, is the only relevant focus in a statutory rape case, the Defendant's pre-hearing statements show his failure to recognize that his actions were wrongful. The cursory apology he issued during allocution does not cure this failure. Having failed to demonstrate his amenability for rehabilitation, the Defendant further fails to carry his burden of showing his suitability for full probation. T.C.A. § 40-35-103(5).

Because the record shows the Defendant abused a position of trust, made threats to the victims, and insisted on the victims' culpability for the sexual contact, the Defendant has failed to show his suitability for full probation. We conclude the Defendant's confinement is necessary to serve the ends of justice and the best interests of the Defendant and the public. *See Blackhurst,* 70 S.W.3d at 97. The offense of aggravated statutory rape carries a range of punishment of two to four years of incarceration. *See* T.C.A. § 39-13-506(c), (d)(3) (2006); T.C.A. § 40-35-112(a)(4) (2006). The Defendant pled guilty to two counts of statutory aggravated rape and agreed to a six-year sentence. In our view, given the nature and characteristics of the victims' rapes as well as the

Defendant's statements demonstrating his lack of remorse, three-years of incarceration followed by three years of probation is an appropriate sentence for the Defendant. *See* T.C.A. § 40-35-210; *Foster*, 2009 WL 275790, *4. Accordingly, we affirm the judgments of the trial court imposing a three-year sentence of confinement in the TDOC in Count I, followed by a three-year sentence of probation in Count V.

### III. Conclusion

After conducting a thorough review of the record and relevant authorities, we conclude the trial court properly admitted the victims' impact statements. Although we conclude the trial court erred when it sentenced the Defendant, following our de novo review we conclude that the sentences ordered by the trial court are appropriate. Accordingly, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE