IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 17, 2017

## STATE OF TENNESSEE v. TEDARRIUS LEBRON MYLES

**Appeal from the Criminal Court for Hamilton County**
**No. 286113   Thomas C. Greenholtz, Judge**

_____

**No. E2016-01478-CCA-R3-CD**

_____

A jury convicted the Defendant, Tedarrius Lebron Myles, of attempted second degree murder, a Class B felony, and employing a firearm during the commission of a dangerous felony, a Class C felony.   The Defendant appeals, arguing that the evidence was insufficient to support the verdicts, that hearsay evidence regarding the Defendant's identity was admitted in error, and that the State failed to qualify an expert witness to testify.   After a thorough review of the record, we conclude that the evidence was sufficient and that the Defendant cannot demonstrate plain error in the admission of evidence, and we accordingly affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Lloyd A. Levitt (at trial) and Michael L. Acuff (at motion for new trial and on appeal), Chattanooga, Tennessee, for the appellant, Tedarrius Lebron Myles.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Neal Pinkston, District Attorney General; and Brian Finlay and Kristen Spires, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The victim, Shaphan Word,[1] was shot from behind while taking a walk during the early morning hours of August 15, 2012, and the video surveillance system of a nearby church captured the shooting. The victim was left paralyzed from the chest down. The victim did not see his assailant, and establishing the Defendant's identity hinged on the video footage from the church's security system.

Prior to trial, the Defendant moved to exclude evidence that he had robbed the victim four or five days before the shooting took place. At the pretrial hearing, the victim testified that the Defendant robbed him and stated that a member of the Defendant's gang had approached him two days after the robbery to determine whether the victim intended to retaliate. The victim testified that he had told the man that he did not intend for it "to go to the level of … shooting anybody." The trial court initially denied the motion to exclude the evidence but ultimately granted a motion to reconsider, and it determined that any references to the robbery would be inadmissible.

At trial, the victim testified that at the time of the shooting, he was working as a cashier at a business located very near his home. He generally worked from around 2:00 p.m. in the afternoon until midnight. On August 14, 2012, he went to work in the afternoon, and he left work in the early morning of August 15, 2012. After work, the victim walked to his home to drop off his apron and then walked to his brother's home nearby. The victim's habit was to take a walk around the neighborhood after work, and when the victim's brother did not answer the door, the victim proceeded to walk along his "normal route," wearing headphones and listening to music. The victim was shot in the back, and the bullet exited through his neck. He was left with paralysis from the chest down and now uses a wheelchair. The victim did not see his assailant.

Investigator Matthew Puglise of the Chattanooga Police Department testified that a neighbor called 911 when he heard three shots and a shout for help. When Investigator Puglise arrived, the victim had already been removed by medical personnel. The victim's clothing, wallet, hat, unopened beer, small marijuana cigarette, music player, and headphones were still on the scene. The neighbor who had called the police alerted officers that a church located nearby was equipped with a security system. Law enforcement went to the church the next day, and Officer Caleb Brooks documented the exterior location of the cameras on the building.

---

[1] Mr. Word's name is spelled "Shapan" in the indictment and inconsistently throughout the record. We utilize the spelling given by Mr. Word during a pretrial hearing.

Mark Hamilton, a civilian employee of the Chattanooga Police Department, extracted videos from the church's security system. Mr. Hamilton testified that the cameras were equipped with sensors and with infrared lighting. The sensors would tell the cameras to switch to infrared mode based on ambient light. He identified the videos that he had extracted and testified that one individual's shirt appeared to switch from dark colored to light colored because the camera had, for an unknown reason, switched to infrared mode. He testified that the color and brightness of items might appear different under infrared light than under sunlight, based on whether the color absorbed or reflected infrared light.

The videos extracted from four different cameras on the outside of the church were played for the jury. The videos showed three young men passing by the church approximately one hour and forty-five minutes before the shooting. The cameras then captured the victim walking through the church parking lot, listening to music. In the background, two young men can be seen approaching, one on a bicycle. The cameras captured the shooter walking through the parking lot on foot and shooting the weapon. Simultaneously, a different camera captured the victim collapsing. The muzzle of the weapon flashed twice on the video recording. Mr. Hamilton testified that because security footage generally records at most thirty frames per second, it is unusual to capture any flashes on film. He testified that because a gunshot takes place in such a short time period, it is more likely to happen between recorded frames and that surveillance footage is more likely to show a recoil from the weapon firing than a flash from the muzzle.

Investigator Puglise testified that at the time he viewed the video footage on August 16, 2017, he had been given a nickname possibly associated with the shooter: "Peanut." He matched the nickname to the Defendant. On cross-examination, he acknowledged that he knew at least two individuals in Chattanooga other than the Defendant who went by the nickname "Peanut." On redirect examination, he clarified that he had three sources for the nickname "Peanut": Investigator Karl Field, Sergeant Joe Shaw, and the victim's sister. He acknowledged that all of the information regarding the nickname came to him third hand and that Sergeant Shaw may have gotten the name from the victim's sister. He testified that Investigator Fields obtained the name from a confidential informant.

Investigator Puglise obtained information regarding the Defendant, including that one of his known addresses was within three blocks of the shooting. He viewed photographs of the Defendant and determined that he generally matched the appearance of the shooter on the video.

The Defendant came to the police station on August 20, 2012, with his mother, who had been alerted that police were looking for him. He denied involvement with the shooting. The Defendant voluntarily accompanied officers to the church parking lot, where he was asked to walk along the same path the shooter had followed. Investigator Puglise testified that the Defendant matched the appearance of the shooter. He testified that the Defendant appeared to be wearing the same shoes in the August 20th video as the shooter wore in the August 15th video. He also testified that the Defendant had a tattoo in the same location and of the same shape as the shooter's tattoo. The August 20th video was extracted by Mr. Hamilton and was shown to the jury.

Investigator Puglise acknowledged that the Defendant did not have to participate in the August 20th "reenactment" video and that he came to the police station voluntarily. When the Defendant was arrested, law enforcement collected gunshot residue and a DNA sample, but neither was tested. The gunshot residue kit was not tested because gunshot residue would not remain on a shooter's hands for five days, and the DNA was not tested because there was no DNA recovered from the scene. Investigator Puglise testified that he was not aware that the Defendant was wearing Deon Sanders shoes or that this shoe was a very popular brand. He testified that having a tattoo is not unusual. A private citizen found three shell casings in the church parking lot on the day following the shooting and turned them over to police. Because the weapon was never recovered, the shell casings were not sent away for testing. Investigator Puglise acknowledged that the distance between the shooter and victim was a "long shot" of approximately forty-nine yards.

The victim testified that he had not viewed the videos until the day before trial, although the prosecution had offered to show them to him earlier. He testified that he met the Defendant approximately three to five days prior to the shooting and that he saw the Defendant three times on the day they met. The victim testified that he recognized two of the men on the video. He had "no doubt" that the shooter was the Defendant. The victim also identified one of the young men who walked through the parking lot with the Defendant prior to the shooting as "Young Michigan." On cross-examination, he testified that he had brief interactions with the Defendant when he met him. On redirect examination, he then testified that on the day he met the Defendant, he saw him first for a matter of seconds. Then, thirty to forty-five minutes later, he was within five to ten feet of the Defendant and saw his face and observed him walking. A minute or two later, he was face-to-face with the Defendant for almost a full minute. The victim testified that he could identify the Defendant in part through his gait, which the victim described as "a weird little walk," and also through his unique haircut. He testified that he did not "know any other person who had [the same haircut] at the time" and that the haircut had a part that was a little lower than the rest of the haircut. The victim had given his family the

name of the shooter as "Peanut" when he woke up in the hospital, prior to viewing the videos.

The Defendant had initially been charged with attempted first degree murder, reckless endangerment, and employment of a firearm during the commission of a dangerous felony. Prior to trial, the State dismissed the reckless endangerment charge and reduced the attempted first degree murder charge to attempted second degree murder. The jury convicted the Defendant of attempted second degree murder and employing a firearm during the commission of a dangerous felony. The Defendant was sentenced to ten years' imprisonment for the attempted second degree murder conviction and to six years' imprisonment for the employing a firearm in the commission of a dangerous felony conviction, to be served consecutively.

The Defendant, represented by new counsel, moved for a new trial, asserting that the evidence was insufficient to support the verdict, that hearsay regarding the Defendant's identity was admitted in error, that Mr. Hamilton should not have been permitted to give expert testimony, that the reenactment video was admitted in error, that the victim should not have been permitted to identify the Defendant, and that the trial court misapplied certain enhancement factors at sentencing. The motion for a new trial was heard by a different judge from the one who had presided at trial, and the trial court denied the Defendant a new trial. As pertinent to the appeal, the trial court found that the evidence, while not overwhelming, was sufficient to uphold the verdict. The trial court also found that the hearsay evidence was "principally" offered to show the investigation conducted by Investigator Puglise. The trial court further found that while the State did not move to have Mr. Hamilton qualified as an expert, the proper foundation was laid for the admission of his testimony as expert testimony, and no objection was lodged. The trial court granted the Defendant a new sentencing hearing based on the previous judge's misapplication of certain enhancement factors, noting that the sentence could increase or decrease after the new hearing. The Defendant and State subsequently agreed to the imposition of the previous sentence, and the sentence is not at issue on appeal.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence. This court must set aside a conviction if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or

reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *Wagner*, 382 S.W.3d at 297.

The Defendant does not dispute that the evidence established the elements of attempted second degree murder and the elements of employing a weapon in the commission of a dangerous felony. *See* T.C.A. §§ 39-12-101(a)(2); 39-13-210(a)(1); 39-17-1324(b)(1), (i)(1)(B). The evidence is sufficient to support the conclusion that the shooter acted with the intent to cause "[a] knowing killing of another" and believed that his conduct would "cause the result without further conduct" from the shooter. T.C.A. § 39-12-101(a)(2); T.C.A. § 39-13-210(a)(1). The shooter also clearly employed a firearm during the commission of attempted second degree murder, a dangerous felony. T.C.A. § 39-17-1324(b)(1), (i)(1)(B).

The Defendant instead asserts that identity was not proven sufficiently. Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *Pope*, 427 S.W.3d at 369 (quoting *State v. Hornsby,* 858 S.W.2d 892, 897 (Tenn. 1993)). Circumstantial evidence may establish identity. *Bell*, 512 S.W.3d at 198-99 (concluding circumstantial evidence that the defendant was the perpetrator was sufficient to uphold the verdict).

On appeal, the Defendant essentially highlights trial counsel's arguments that there were dissimilarities between the appearance of the shooter and the appearance of the Defendant in the reenactment video. In particular, he notes that trial counsel argued

that the hair of the Defendant in the August 20th video had a prominent part and was longer than the shooter's hair on August 15th. Trial counsel also argued that it was not clear that the patch on the shooter's forearm was a tattoo. The Defendant notes that without the video, the State's proof is weak, and he argues that there was no motive for the killing. Initially, we observe that motive is not an element of the offense. *State v. Moss*, 13 S.W.3d 374, 389 (Tenn. Crim. App. 1999); *see Bell*, 512 S.W.3d at 191 (noting motive is not an element of first degree murder).

The Defendant does not assert that the video was inadmissible but only that the jury should not have inferred that the shooter in the video was the Defendant. In reviewing the sufficiency of the evidence of the Defendant's identity, we afford the State the strongest legitimate view of the evidence and all reasonable inferences to be drawn from it. *Thomas*, 158 S.W.3d at 388. Here, the proof before the jury established that the victim knew the Defendant and had ample opportunity to observe him approximately four days before the shooting. The victim testified regarding the Defendant's unique haircut and gait. The jury was presented with video of the shooter as well as video of the Defendant filmed with the same equipment at the same location under similar circumstances. The shooter's appearance is consistent with the Defendant's in physique, movement, and general hairstyle. Both have a similarly shaped tattoo in the same location. The shooter and Defendant appear to be wearing the same shoes. While the record supports the trial court's finding that the evidence of identity is not overwhelming and that "the original video does not absolutely identify the perpetrator," the numerous similarities in the two videos between the shooter and the Defendant could lead to the reasonable inference that the Defendant was the shooter. The evidence also included the victim's identification of the Defendant based on the video. The victim testified that he was certain the shooter depicted on film was the Defendant. *See Thomas*, 158 S.W.3d at 388 (the defendant's ex-wife identified the defendant in stills taken from surveillance video). "In the resolution of questions of fact, such as … the identity of the perpetrator, 'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *Pope*, 427 S.W.3d at 369 (quoting *State v. Hornsby,* 858 S.W.2d 892, 897 (Tenn. 1993)). We conclude that, based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that the Defendant was the shooter. The evidence is sufficient to uphold the verdict.

## II. Plain Error in the Admission of Evidence

The Defendant objects that certain evidence was permitted to be placed in front of the jury in error. More specifically, he argues that any hearsay statements identifying him as the shooter should have been excluded, and he argues that Mr. Hamilton's testimony regarding the video should have been excluded because he was not qualified as an expert. He acknowledges that his trial attorney did not object to any of this evidence.

*See* Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a). Accordingly, he requests this court to review the record for plain error.

For an error to constitute plain error sufficient to merit relief, the following factors must be present: a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "'plain error must be of such a great magnitude that it probably changed the outcome'" of the proceeding. *Bishop*, 431 S.W.3d at 44 (quoting *Adkisson,* 899 S.W.2d at 642). This court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010).

### A. Hearsay Evidence

The Defendant asserts error in the trial court's admission of hearsay statements connecting him with the shooting, in particular Investigator Puglise's testimony that he was given the nickname "Peanut" by three sources. Because the Defendant's trial attorney did not object to the testimony, the Defendant seeks plain error review.

The Defendant's argument appears to be in part premised on the theory that, by introducing the hearsay evidence that the Defendant was implicated in the shooting, the prosecutor ignored the court's ruling to exclude evidence of the robbery under Tennessee Rule of Evidence 404(b). We need not tarry long with this argument. While it is true that the victim apparently suspected that the Defendant was the culprit based on speculation that the Defendant shot him to prevent retribution for the robbery, evidence of the robbery was never in any form put before the jury. Accordingly, the Defendant was successful in excluding evidence of the robbery, despite the fact that it may have been pertinent to his motive.

The Defendant also asserts that, given the weak proof on the issue of identity, the hearsay evidence that he had been identified as the shooter was prejudicial. The Defendant requests plain error review of the admission of the evidence. The trial court found that the hearsay regarding the Defendant's identity had been "principally … offered to show steps that were being taken in the investigation."

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. However,

error may only be predicated on the admission of hearsay evidence when there has been a timely objection. *See* Tenn. R. Evid. 103(a)(1) (error may not be predicated on the admission of evidence unless a timely objection or motion to strike was made and a substantial right of the party is affected); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). "A trial court … generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). When hearsay is admitted without objection "'it is … rightly to be considered as evidence in the case and is to be given such weight as the jury think[s] proper.'" *Id.* at 280 (quoting *State v. Bennett,* 549 S.W.2d 949, 950 (Tenn. 1977)). We note that "rarely will plain error review extend to an evidentiary issue." *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007).

We conclude that the Defendant cannot demonstrate plain error in admitting this evidence. We note initially that the State argues that the Defendant made a tactical decision not to object to the hearsay. While it is true that the Defendant chose to cross-examine Investigator Puglise about the information that the name of the shooter was "Peanut," highlighting that it was not a unique name, it is not clear that the Defendant made a tactical decision to forgo objection to the initial hearsay statements that he was the shooter.

In any event, plain error requires the breach of a clear and unequivocal rule of law. *Bishop*, 431 S.W.3d at 44. Here, the statements made by the victim's sister and the confidential informant were hearsay. While the statements might have been admissible on the limited issue of the reasonableness of Investigator Puglise's investigation and not for the truth of the matter asserted, *see, e.g.*, *State v. Brandon Churchman*, No. W2013-00175-CCA-R3-CD, 2014 WL 12651043, at *11 (Tenn. Crim. App. Apr. 28, 2014), no limiting instruction was requested or given, and the jury was therefore permitted to consider the statements for the truth of the matter asserted. However, because "[a] party may consent to the admissibility of evidence which is otherwise prohibited by the Rules, so long as the proceedings are not rendered so fundamentally unfair as to violate due process of law," the trial court's decision to admit the evidence breached no clear and unequivocal rule of law absent an objection by the Defendant. *Smith*, 24 S.W.3d at 279. The trial court was not required to exclude the evidence or give a limiting instruction absent objection. *State v. Little*, 402 S.W.3d 202, 215 & n.8 (Tenn. 2013) (noting that limiting instruction regarding proof of prior bad acts would have been preferable but that the court was not under obligation to give it sua sponte). While the evidence was certainly subject to exclusion or to a limiting instruction, no rule of law required it to be excluded if the parties consented to its admissibility. The admission of the evidence did

not render the proceedings so fundamentally unfair as to violate the Defendant's right to due process, particularly since the jury was aware that two of the identifications could be traced to the victim, who acknowledged that he had not seen his assailant. Accordingly, no clear and unequivocal rule of law was breached.

Neither can the Defendant show that consideration of any error is necessary to do substantial justice. The jury was aware that the victim's sister received the information that the Defendant may have been the shooter from the victim, and the jury was likewise aware that the victim had not seen his assailant. The jury was also aware that "Peanut" was not a unique nickname. Compared with the video evidence of the shooting, the fact that a confidential informant and the victim's sister provided the Defendant's nickname to police had relatively little weight.

### B. Expert Testimony

The Defendant objects that Mr. Hamilton's testimony regarding the video tape was admitted in error because he was not qualified as an expert by the prosecution. He argues that the defense was not able to counter Mr. Hamilton's explanation regarding the appearance of objects under infrared light. He also argues that Mr. Hamilton's testimony discredited the Defendant's theory that the person on the video only fired two shots and that the bullet which actually hit the victim came from a second, unidentified shooter. The Defendant acknowledges that his trial attorney did not object to the testimony, and he requests plain error relief. The trial court denied relief because no objection had been made, and it found that the foundation had been laid for the admission of the testimony as expert testimony, although the State failed to request that the witness be qualified as an expert.

Under Tennessee Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Evidence requires expert testimony if it concerns a matter that "'the average juror would not know, as a matter of course....'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin,* 922 S.W.2d 870, 874 (Tenn. 1996)). The erroneous admission of expert testimony when the requirements of Rule 702 have not been met may result in reversal. *See id.* (concluding that testimony regarding the Horizontal Gaze Nystagmus test was admitted in error over the defendant's objection because the witness was not qualified as an expert, and remanding for a new trial when the State's evidence consisted primarily of testimony regarding that test).

However, the Defendant here failed to object to the testimony, waiving the issue. *See* Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a). When the defendant fails to object to expert testimony offered by a lay witness, the defendant is not entitled to plenary review. *State v. Alphonso Bowen*, No. W2015-01316-CCA-R3-CD, 2016 WL 6776348, at *7 (Tenn. Crim. App. Nov. 15, 2016), *perm. app. denied* (Mar. 9, 2017) (holding that failure to object to witness testifying regarding fingerprints without being qualified as an expert was waived); *State v. John Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *18 (Tenn. Crim. App. Apr. 26, 2010) (concluding that the defendant was only entitled to plain error review when no objection was made to the prosecution's expert witness); *State v. Raymond Edward Peebles*, No. M2005-01130-CCA-R3-CD, 2006 WL 2682817, at *5 (Tenn. Crim. App. Sept. 12, 2006) (holding that a challenge to testimony based on a failure to qualify expert witnesses was waived and the defendant could not show that the outcome of the trial was affected by any error because crime was captured by video evidence).

In general, "[w]hen a party does not object to the admissibility of evidence, … the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *Smith*, 24 S.W.3d at 280 (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)). The rationale behind this rule is that an objection may allow the opposing party to remedy any issues and make the evidence competent; otherwise, a party could withhold an objection until appeal, to its advantage. *Welch v. Bd. of Prof'l Responsibility for the Sup. Ct. of Tenn.*, 193 S.W.3d 457, 464 (Tenn. 2006).

Mr. Hamilton testified regarding the appearance of objects on video filmed with infrared lighting, and he testified regarding the probability of the camera capturing the flashes emitted by the muzzle of the shooter's gun. These are matters that "'the average juror would not know, as a matter of course'" and would properly have been the subject of expert testimony. *Murphy*, 953 S.W.2d at 203 (quoting *Bolin,* 922 S.W.2d at 874).

The State, citing the Defendant's closing argument which highlighted differences between his appearance and the shooter's, asserts that the Defendant made a tactical choice to admit the expert evidence regarding the videos. We note that no part of the Defendant's closing argument relates to Mr. Hamilton's testimony. However, we conclude in any event that the Defendant is not entitled to relief.

The Defendant has not shown that the trial court breached any clear and unequivocal rule of law by allowing Mr. Hamilton to testify. When the testimony was not objected to, it became admissible and competent evidence. *Smith*, 24 S.W.3d at 280. The trial court was not required to exclude it for any reason.

Furthermore, relief is not necessary to do substantial justice. The trial court essentially found that, had it been asked to do so, it would have qualified Mr. Hamilton as an expert. We note also that Mr. Hamilton's testimony regarding the colors of the infrared video had little bearing on the ultimately contested issue of the Defendant's identity, because the Defendant was filmed again by the same camera under the same conditions, and the jury could match the Defendant's image on that date with the shooter's image. *See State v. Dotson*, 450 S.W.3d 1, 72 (Tenn. 2014) (concluding plain error relief was not necessary to do substantial justice because autopsy reports did not implicate the defendant or introduce contested proof). While the Defendant had a theory that, even if the jury found that he was the shooter caught on the video, it was still possible that a second shooter inflicted the actual injury on the victim, this theory ignores the fact that the Defendant was convicted of attempted second degree murder, which does not require a finding that the victim was injured. The elements of the offense were met whether the shooter fired two shots or three. Mr. Hamilton's testimony had no bearing on the contested issue at trial: the identity of the perpetrator. Furthermore, the trial court found that the foundations for admitting the testimony as expert testimony were laid. Because the Defendant cannot show that relief is necessary to do substantial justice, he is not entitled to plain error relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE